LIGONIA *v.* BUXTON.

A minister ordained over an unincorporated religious society, composed of members belonging to different towns, is not a *stated and ordained minister of the gospel*, within the meaning of *Stat.* 1786, *ch.* 3.

A marriage solemnized by a minister at his own house, neither of the parties residing in that town, is void under *Stat.* 1786, *ch.* 3.—and this statute is not altered in this respect by *Stat.* 1811, *ch.* 6.

The resolve of *March* 19, 1821, does not render valid a marriage solemnized *against* the laws then in force. It only confirms those which, through misapprehension of the law, were defectively solemnized, the minister being not a *stated and ordained minister*, though erroneously supposed to be such.

*Assumpsit* for the support of a pauper named *Mary Brazier*, the supplies furnished commencing *March* 28, 1821.

In a case stated to the Court, it was agreed that her settlement was in *Buxton*, unless she had gained another by her supposed marriage with one *Joseph Brazier* in the year 1814, the validity of which was the only question in the case. At the time of this supposed marriage he resided in *Palermo* and she in *Montville*, in the county of *Lincoln ;* and the marriage was solemnized by *Isaac Hall*, an elder of the Baptist church, at his dwelling house in the plantation of *Knox* in the county of *Hancock*, adjoining *Montville*, there being then no settled ordained minister resident either in *Knox* or *Montville*. *Mr. Hall* was ordained in 1806, after the usages of the sect to which he belonged, over an unincorporated religious society composed of individuals resident in the towns of *Unity*, *Montville*, and the plantation of *Knox*, in the respective counties of *Kennebec*, *Lincoln*, and *Hancock*. *Brazier* left his wife in 1820, and had not cohabited with her since.

Ligonia v. Buxton.

*Allen*, for the plaintiffs.

The objections to the validity of the marriage are twofold;—viz.—

That the person by whom the marriage ceremony was performed was not authorized to solemnize marriages in *any case;*—

And that if he was generally authorized, yet he was not so as it respected these parties.

Neither is the marriage rendered valid by the resolve of ·*March* 19, 1821, legalizing certain marriages:

1. The statute respecting marriages, 1786, *ch.* 3, provides that every *stated* and ordained minister in the town, district, parish or plantation where he may reside, shall be authorized to solemnize marriages, when one or both of the parties to be joined in marriage are inhabitants of, or resident in, the town, district, &c. where such minister shall reside. But the nature of *Mr. Hall's* ordination, and of his various duties and obligations, preclude all supposition of his being a *stated* minister within the meaning of the statute. The church over which he was ordained extended into three distinct towns or plantations, and as many counties. In what place, then, could he be said to be a stated minister? His case is very similar to that of *Comfort Smith*, who was convicted in this county at the S. J. Court *October* term, 1818, for pretending to join persons in marriage, he not having the requisite qualifications, but was afterwards pardoned by the executive. A minister thus ordained could not recover taxes paid by his parishioners into the treasury of the town, for the support of public worship. *Kendall v. Kingston*, 5 *Mass.* 524.

2. *Mr. Hall*, if generally qualified, had no authority to join these persons in marriage. On this point the statute is explicit. Where there is no minister in the town where either of the parties reside, the minister of the next town may perform the ceremony, " provided it be done in the town where one of the parties reside." But this marriage, having been solemnized in *Knox* where neither of them resided, is clearly out of the protection of the law.

3. The resolve of *March* 19, 1821, for making valid marriages, and for other purposes, is, to say the least of it, an ex-

Ligonia *v.* Buxton.

traordinary act of legislation. How far it might be effectual as between parties themselves applying for its passage, is not now the question; for the case finds that *Brazier* had ceased to cohabit with the pauper long before the date of the resolve. Between these persons it has no operation, because they never applied to the legislature for this provision,—*Ellis v. Marshall,* 2 *Mass.* 269—and their dissent is clearly implied from their living apart.

But whatever may be its effect upon these persons, it cannot be construed to affect the rights of other persons or corporations. If the settlement of the pauper was in *Buxton* before the passage of the resolve, by what rule can it, without any act of her own, or of the plaintiffs, and without her knowledge or consent, be transferred to *Ligonia?* To give it this effect would present the singular case of a marriage made between parties actually resident at the time in different towns, and without any assent of either, or any knowledge or suspicion that they were thus to be united:—a construction as little in advancement of public policy, as of domestic happiness. The resolve is void as interfering with vested rights. Before its passage the pauper had her settlement in *Buxton,* on which town the plaintiffs had a right to call for the reimbursement of any sums they might be obliged to advance for her relief. This right the resolve takes away. *Wales v. Stetson,* 2 *Mass.* 143. It impairs the obligation of contracts. *Sturgis v. Crowninshield,* 4 *Wheat.* 208. *Dartmouth College v. Woodward, ib.* 518. Nor can it have the effect of rendering the marriage valid from the time the ceremony was performed; for this operation is retrospective, and therefore void. *Dash v. Van Kleick,* 7 *Johns.* 477. *Society v. Wheeler,* 2 *Gall.* 134.

*Greenleaf,* for the defendants.

1. *Mr. Hall* was ordained, after the usages of his own sect, over a church and society not incorporated by law, but voluntarily associated and gathered out of the town of *Unity,* and the adjoining plantations of *Montville* and *Knox.*

By *Stat.* 1811, *ch.* 6, unincorporated religious societies are expressly recognized, and thenceforth must be known in law: and they thus give a character to a minister *set over them.*

Ligonia *v.* Buxton.

And hence, since the passage of that statute, a minister regularly ordained over a church and society not incorporated, must be taken to be a " stated and ordained minister of the gospel." It is not such ministers that the resolve of 1821 considers as not stated and ordained;—but the ministers of the methodist and other communions, who are ordained as travelling evangelists, without any local charge. The term *parish*, occurring in our statutes since the year 1811, can hardly be considered as any longer limited to territorial bounds, but is become, in one sense, synonymous with *society*. These principles are supposed to be supported by *Baldwin v. McClinch*, 1 *Greenl.* 102.

The word *parish* in *Stat.* 1817, ch. 141, is believed to have the force abovementioned, and to mean " the limits of the minister's parochial or spiritual charge ;"—and this whether lying in one town or in several. The marriage therefore, being within the " parish" where one of the parties, *viz.* the woman, resided, and solemnized by a stated and ordained minister of the gospel, was valid.

2. If not, it was made valid by the resolve of *March* 19, 1821. Marriages are to be supported and encouraged by the civil magistrate, on the ground of public policy, to prevent wanton and lewd cohabitation, and the consequent dissoluteness of public morals. *Milford v. Worcester*, 7 *Mass.* 52. *Medway v. Needham*, 16 *Mass.* 160. On these principles the resolve was passed. A large number of marriages were supposed to be illegal, and parties were tempted to avail themselves of the legal advantages thus presented, to forsake each other and bastardise their issue. It was accordingly resolved, by way of public remedy, that " all marriages between parties competent by law to contract " marriage, and whose intentions of marriage were legally pub-" lished, shall be deemed and taken to be good and valid in " law, to all intents and purposes." Now this being *such* a marriage, it is legalized by the express language of the resolve.

To the objection that these persons did not assent to the resolve, they continuing to live apart,—it is answered—1. They assented to a legal marriage, doing all in their power to contract and consummate it; and the resolve does no more than confirm what the parties supposed valid, and probably still deem so.— 2. The resolve, as it specially excepts the case of all who, hav-

Ligonia *v.* Buxton.

ing been thus married, " have since separated, and one of the
" parties has been legally joined in marriage with another
" person," does, by necessary implication, include all who live
apart, not having contracted a second marriage.—3. If the
want of express assent is a valid objection, yet third persons
have no right to make it. It lies in the mouth of none but the
parties to the marriage or their heirs at law. And so is the
doctrine of *Ellis v. Marshall*, 2 *Mass.* 269.—4. All persons are
to be presumed to assent, who had not subsequently contracted
another marriage. The resolve was dictated by high consid-
erations of public policy, and for the conservation of public and
domestic peace. And the legislature had a right to declare that
contracts thus solemnly made should be binding. They were
valid *in foro conscientiæ.* So are verbal contracts for the sale
of real estate. Yet even *these* contracts are held binding when
part executed. And ought not a marriage to be held valid,
when consummated by cohabitation ? Who is wronged by giv-
ing the resolve the effect originally intended by the parties ?

To say that the resolve operates only to render a marriage
legal from the time of its passage, and not from the time of the
marriage, is in effect to make a *new marriage*, commencing on
that day. This construction at once excludes from the benefit
of the resolve all those marriages where one of the parties was
then *dead*, or *non compos*—together with the children, in both
cases, as well as all children then born, whose parents were
still living. And these classes of persons probably compose
more than half the number of cases on which the resolve was
intended to operate. What then becomes of the claim of
dower,—or of estates already descended to children, and per-
haps to grandchildren,—or hereafter to be claimed by those
born before the passage of the resolve ? Such a construction,
inviting endless litigation among lineals, and collaterals, and
working so much injustice to those whose rights it was doubt-
less the great object of the legislature to secure, it is believed
the Court will not willingly adopt.

The resolve affects no vested rights, and impairs no con-
tracts, for none existed in this case till the supplies were fur-
nished, which was not till after the date of the resolve. And as
to the objection that legal settlements are thus arbitrarily

Ligonia *v.* Buxton.

changed, it lies equally against many other general laws, of long standing, whose binding force was never questioned, because of their *general* application.

*Allen,* in reply.

The preamble to *Stat.* 1811, *ch.* 6, together with its enactments, sufficiently explain the objects of the legislature, and the objects apparent on the face of it are of sufficient importance to account for its passage and extend its operations, without enlarging its provisions by construction. There is nothing in it which dispenses with the qualifications required in a minister who is authorized to solemnize marriages by *Stat.* 1786, *ch.* 3. Its object is rather to enlarge the privileges of members, than to extend the authority of the teachers, of unincorporated societies. But such rights as are conferred by the statute of 1811, are so particularly defined as to preclude any implication. It was principally designed to enable such teachers to recover the money paid by their hearers into the treasury of the town, and to exempt them from taxation. It enacts that " all (such) minis- " ters shall have the same exemptions from taxation as are " given to stated and ordained ministers of the gospel;"— clearly recognizing a distinction between *such* ministers, and those who are stated and ordained,—investing them, *thus far,* with the same privileges, and limiting it to the same extent. The term *stated* has obviously a reference to place, and cannot properly be applied to one who is ambulatory, whether in a smaller or larger circle.

The operation of the resolve of 1821 to render *any* marriage legal, which was not originally so, may well be questioned. But the difficulties in giving it a construction to legalize the marriage in question are insuperable. If it was not legal when the ceremony was performed, it must be regarded as void;— there is no medium;—it was nothing more than an agreement to marry, between persons who afterwards changed their minds. Their cohabitation, if evidence of their sense of the contract as a legal marriage, is more than counterbalanced by their subsequent separation. The exception in the resolve of those who have separated, and one of the parties " has been joined in *legal* marriage," though unmeaning, as such persons must have

remained unaffected, yet is a strong expression of the opinion of the legislature that the second marriage in such cases *is* legal, and consequently that the first was void. That being the case, it would be a singular exercise of legislative authority to declare that certain individuals might lawfully contract matrimony, but that when they had not availed themselves of this privilege they should be considered as already married to other persons.

The evils anticipated as resulting from the construction now contended for, are not chargeable upon the law, but grow out of the illicit connection of the parties, and are concomitants of a state of society where the laws regulating the marriage contract, which are plain and simple, are disregarded. Where this has been done inadvertently, it is just that punishment should be remitted, but the parties cannot reasonably claim of the Court all the privileges of those who have been joined in lawful wedlock.

The arguments, of which the foregoing is a summary, having been submitted in writing during the vacation, the opinion of the Court was now delivered as follows, by

MELLEN C. J. In deciding this cause it is not necessary to consider all the objections and arguments which were urged on the trial. It is very clear that the marriage of the pauper with *Joseph Brazier* is void, according to the statute of 1786, *ch.* 3. *Mr. Hall* was not a *stated and ordained* minister of the gospel, within the meaning of that act. This is plain from the words of the act, and so it was decided in the case of *Comfort Smith* cited by the plaintiffs' counsel. And if he *had been* a settled and ordained minister in *Knox*, the marriage was void, because solemnized in *that* town, in which neither of the parties then resided, which is against the express directions of the statute.

It is equally clear that the *Stat.* 1811, *ch.* 6, cited by the defendants' counsel has made no alteration of the act of 1786, on the subject of marriages, nor given any power of joining persons in marriage, either express or implied, to ministers or teachers who are not *stated and ordained* in the manner contemplated in the latter act. And it is also equally clear to our minds that the marriage has not been confirmed by the resolve of *March* 19, 1821. We shall only assign *one* reason for this

opinion, though perhaps we might assign more if necessary. The preamble refers to " sundry marriages" which had been " solemnized within this State by ministers of the gospel who " were not *stated and ordained* ministers of the gospel, within the " meaning of the laws then in force; and who were believed to " have been under a *mistaken apprehension of the law*, and to " have supposed they were legally authorized to solemnize " marriages," &c.—and the resolve professes to confirm *such* marriages, and does not, in its language, embrace any others. The legislature evidently proceeded on the idea that the marriages they were confirming were in *all respects* solemnized according to law, excepting in the circumstance mentioned in the preamble,—viz.—the want of authority ; and the " mistaken " apprehension of the law." They surely have not intimated any intention to confirm those marriages which had been solemnized in open violation of it. We ought then to give such a construction as to effectuate their intention, and nothing more.

It is unnecessary to make any further observations respecting the resolve, or its legal effects, because we are perfectly satisfied that it was never intended to be applied to such a marriage as that we have been considering, solemnized as that was, in direct violation of a statute long in force, and universally known. The result is that the action is maintained, and the defendants must be defaulted.