### Marie B. HENRIKSEN

v.

### John Malcolm CAMERON.

Supreme Judicial Court of Maine.

Argued April 28, 1992.
Reargued Sept. 18, 1992.
Decided March 24, 1993.

---

Paul F. Macri (orally) and Tyler Kolle, Berman & Simmons, Lewiston, for plaintiff.

Peter L. Murray (orally) and Ann M. Courtney, Murray, Plumb & Murray, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS and RUDMAN, JJ.

COLLINS, Justice.

In this case, we are asked to decide whether a spouse, now divorced, may recover for emotional suffering intentionally inflicted by the former spouse during their marital relationship through physical violence and accompanying verbal abuse. A jury returned a verdict in favor of the injured plaintiff, Marie B. Henriksen, in her action for intentional infliction of emotional distress against her former husband, John Malcolm Cameron. Cameron appealed asserting two evidentiary challenges and raising the question whether Henriksen's tort action is barred after the parties' divorce judgment by the doctrine of *res judicata*. In addition, he argues that the action is barred by the doctrine of interspousal immunity. We hold that Henriksen's action for intentional infliction of emotional distress is not barred either by the doctrine of interspousal immunity or *res judicata*. We also find that the evidentiary issues raised by Cameron did not constitute reversible error. Therefore, we affirm the judgment.

### Facts and Procedure

The parties met in England in November 1973 and were married in March 1974. They lived in Goose Rocks Beach where they operated Henriksen's seasonal hotel, the Tides Inn. Henriksen and Cameron separated in the fall of 1986. During the course of their marriage, Cameron physically and emotionally abused Henriksen. This abuse ranged from Cameron's accusing Henriksen of "sleeping with" his brother to his raping and assaulting her.[1] Following the separation, Henriksen filed a complaint for divorce on the ground of cruel and abusive treatment. On the day the divorce was scheduled to be heard, the parties engaged in settlement negotiations, and agreed that Henriksen would amend the ground of her divorce complaint to irreconcilable differences. In July 1988, the Superior Court (York County, *Cole, J.*) granted the parties a divorce on the ground of irreconcilable differences and, following the parties' oral settlement agreement, divided their marital property and ordered that neither party was required to pay alimony, separate support, or maintenance to the other.

---

**1.** Cameron's actions included, for example: shattering the doors of kitchen cabinets while he "came after" her meanwhile calling her a "lying, whoring bitch" who was "stealing money from him;" calling Henriksen at a friend's house where she was staying because she was afraid to come home and threatening to burn down the inn; tearing down a wall in the dining room before she returned; swaying over her bed and threatening to "get" her; threatening that Henriksen would get what his mother got (referring to his father's beating his mother); and pulling the telephone out of the wall and telling Henriksen he did so to prevent her from calling for help. Most of this conduct occurred while Cameron was intoxicated.

In April 1989, Henriksen sued Cameron for intentional and negligent infliction of emotional distress resulting from physical and psychological abuse. At the close of Henriksen's case, the Superior Court (*Fritzsche, J.*) granted a directed verdict in favor of the defendant on the negligent infliction of emotional distress claim.[2] Since we are not vacating the judgment, only the intentional infliction of emotional distress claim is before us.

The jury found in favor of Henriksen on the intentional infliction of emotional distress claim and awarded her $75,000 in compensatory damages and $40,000 in punitive damages. Cameron appeals from that judgment.

## I.

### *Interspousal Immunity*

In 1877, we embraced the doctrine of interspousal immunity, holding that "the general principle of the common law [is] that husband and wife are one person ... and ... being one person, one cannot sue the other." *Abbott v. Abbott*, 67 Me. 304, 306 (1877). In *Abbott* we reasoned, "it is better to draw the curtain, shut out the public gaze, and leave the parties to forgive and forget." *Id.* at 307. The *Abbott* court held that a tort remedy was not necessary, stating:

> Practically, the married woman has remedy enough. The criminal courts are open to her ... [and] [a]s a last resort, if need be, she can prosecute at her husband's expense a suit for divorce.

*Id.* See also *Moulton v. Moulton*, 309 A.2d 224 (Me.1973) (interspousal immunity did not bar action for conduct prior to marriage but did bar action for conduct occurring during marriage).

██ In a 1980 negligence action by a wife against her husband for injuries sustained in an automobile accident, however, we overruled *Abbott*, holding:

> [O]ne person is not precluded from maintaining an action to recover damages caused by the alleged tortious conduct of another person solely because the conduct complained of occurred while they were husband and wife.

*MacDonald v. MacDonald*, 412 A.2d 71, 73 (Me.1980). We adopted a cautious approach, however, and in a footnote, said:

> [T]his decision does not extend to other areas of the law where the special nature of the marital relationship may have impact for various other reasons of policy. Examples of such different considerations of policy are ... the treatment of particular conduct between husband and wife, by virtue of the mutual concessions that may be implicit in the marital relationship, as privileged or not tortious, even though such conduct as between persons not married to each other may not be so regarded.

*Id.* at 75 n. 5.[3] The issue before us then, is whether physical violence accompanied by verbal abuse that was intended to inflict emotional distress is, by virtue of the mutual concessions implicit in marriage, privileged or not tortious because the parties were married to each other when that violence occurred. We hold that it is not so privileged.

In *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148 (Me.1979), we recognized the tort of intentional infliction of emotional distress and adopted the definition provided by the *Restatement (Second) of Torts* § 46. Accordingly, a plaintiff asserting in-

---

2. On cross appeal, Henriksen asserts that if this court remands for a new trial, this claim should be reinstated.

3. In fact, this approach to interspousal immunity is a common one. One commentator has stated:

> With the general extinguishment of interspousal immunity, there has been a concern that every divorce action could become a tort action.... Even with the elimination of immunity there is general agreement that not

> every act between strangers should be tortious between spouses. There are "mutual concessions implied in the marital relationship." The courts must respect the "ebb and flow of married life." Liability is usually limited to those situations where a clear abuse of marital privilege exists.

Robert G. Spector, *Marital Torts: Actions for Tortious Conduct Occurring During the Marriage*, 5 Am.J. of Fam.L. 71, 72 (1991).

tentional infliction of emotional distress is required to show:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so "severe" that "no reasonable man could be expected to endure it."

*Id.* at 154 (citations omitted). We later recognized that "[a] person's psychic well-being is as much entitled to legal protection as is his physical well-being." *Gammon v. Osteopathic Hosp. of Me., Inc.*, 534 A.2d 1282, 1283 (Me.1987).

Deciding actions for intentional infliction of emotional distress arising from conduct occurring within the marital setting requires special caution. Policy concerns raised in *Abbott* over 100 years ago remain important today. Certainly we no longer consider the husband and wife a single legal entity barring all suits between them.[4] Nevertheless, we do recognize the desire to preserve marital harmony. In this case, brought after the parties were divorced, there is clearly no marital harmony remaining to be preserved. Moreover, behavior that is "utterly intolerable in a civilized society" and is intended to cause severe emotional distress is not behavior that should be protected in order to promote marital harmony and peace.[5]

A second policy concern is the threat of excessive and frivolous litigation intruding into the marital lives of the parties. Admittedly, this is of particular concern after a divorce since the events leading to most divorces involve some level of emotional distress and the likelihood of vindictive post-divorce litigation may be especially high. One court has expressed this concern as follows:

> [I]n determining when the tort of outrage [i.e. intentional infliction of emotional distress] should be recognized in the marital setting, the threshold of outrageousness should be set high enough—or the circumstances in which the tort is recognized be described precisely enough . . .—that the social good from recognizing the tort will not be outweighed by unseemly and invasive litigation of meritless claims.

*Hakkila v. Hakkila*, 112 N.M. 172, 812 P.2d 1320, 1326 (App.1991). The showing required of a plaintiff in order to recover damages for intentional infliction of emotional distress provides a built-in safeguard against excessive and frivolous litigation. The plaintiff must prove that the defendant's conduct was so "extreme and outrageous" it exceeded "all possible bounds of decency." *Restatement (Second) of Torts* § 46. Jurors, many of whom are themselves married, are in the best possible position to determine what behavior between spouses is "atrocious and utterly intolerable in a civilized community," *id.*, and what behavior is within the "ebb and flow" of married life. In order to protect defendants from the possibility of long and intrusive trials on meritless claims, motions for summary judgment should also be

---

4. That married couples were ever considered one legal entity, i.e., the husband, demonstrates the difficulty women have faced in the courts of this country. The 1988 Conferences of the Chief Justices, held in Rockland, Maine and representing courts throughout the country, adopted a significant resolution urging positive action by chief justices to address the issue of gender bias in the court system. Resolution XVIII, Conferences of the Chief Justices (Aug. 4, 1988). Because the existence of gender bias has been well documented nationally, this court has promulgated an order, effective January 1, 1993, establishing a Commission on Gender, Justice, and the Courts. This Commission will consider how gender affects the treatment of women and men in the legal and judicial environment and will develop a program to ensure that gender-based myths, biases, and stereotypes do not affect judicial decision making. One area of study for the Commission will also be domestic violence.

5. The Legislature has moved in a similar direction by expanding the State's rape statute to include non-consensual intercourse between spouses as criminal conduct. *See* 17-A M.R.S.A. § 253 (Supp.1992).

viewed sympathetically in interspousal cases. *See Hakkila,* 812 P.2d at 1327.

Another policy concern raised in *Abbott* was that a tort action for compensation was simply redundant. *Abbott,* 67 Me. at 307. In Maine, a spouse may seek the cessation of abuse via a protective order or a consent agreement. 19 M.R.S.A. § 766 (1981 & Supp.1992). Violation of a protective order or consent agreement constitutes a Class D crime. 19 M.R.S.A. § 769 (1981 & Supp.1992). These provisions, however, provide no compensatory relief for injuries sustained. *Id.; see also Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951, 962 (1978) ("The criminal law may vindicate society's interest in punishing a wrongdoer but it cannot compensate an injured spouse for her or his suffering or injury.").

■ Divorce also provides no compensatory relief. *See Merenoff,* 388 A.2d at 962 ("Divorce or separation provide escape from tortious abuse but can hardly be equated with a civil right to redress and compensate for personal injuries."). In Maine, courts are not allowed to consider fault in the distribution of property on divorce. *Eaton v. Eaton,* 447 A.2d 829, 831 (Me.1982) (citing *Boyd v. Boyd,* 421 A.2d 1356, 1357–58 (1980)). We have also stated that "[a]limony is intended to fill the needs of the future, not to compensate for the deeds of the past." *Skelton v. Skelton,* 490 A.2d 1204, 1207 (Me.1985).[6]

Courts around the country have recognized that public policy considerations should not bar actions for intentional infliction of emotional distress between spouses or former spouses based on conduct occur-

ring during the marriage. *See, e.g., Hakkila,* 812 P.2d at 1320 (action for the tort of outrage, i.e. intentional infliction of emotional distress, is not barred in interspousal context); *McCoy v. Cooke,* 165 Mich.App. 662, 419 N.W.2d 44 (1988) (reversing trial court's dismissal of wife's action for assault and battery and intentional infliction of emotional distress against her former husband for his conduct during marriage); *Courtney v. Courtney,* 186 W.Va. 597, 413 S.E.2d 418, 420 (1991) (same); *Stuart v. Stuart,* 143 Wis.2d 347, 421 N.W.2d 505 (1988) (same).

Even this court, without addressing interspousal immunity, has upheld a jury award in favor of a wife who sued her former husband for assault and battery and intentional infliction of emotional distress based in part on conduct occurring during the marriage. *Caron v. Caron,* 577 A.2d 1178 (Me.1990). Mr. Caron did not challenge nor did we question the admissibility of evidence of conduct occurring prior to the parties' divorce but within the scope of the statute of limitations to prove his former wife's case of intentional infliction of emotional distress. *Id.* Nor did we mention in *Caron* any bar against recovery for intentional infliction of emotional distress occurring during the marriage.

No valid public policy suggests making the intentional infliction of emotional distress through physical violence and accompanying verbal abuse during the marriage privileged conduct. Nor do our decisions or those of a majority of other courts support such a conclusion. We hold, therefore, that such an action between spouses is not barred by interspousal immunity.

---

6. This decision is clearly supported by the legislative history surrounding the alimony statutes. The Legislature's recent efforts to establish more specific alimony guidelines were intended to prevent fault from being a consideration in alimony awards without eliminating the discretion of the courts completely. The primary sponsor of this legislation testified that:

[A]lthough divorce is supposed to be *no-fault* in Maine and most of the rest of the country, we can all name a case where the economic impact was clearly derived at by a judge who did make a determination of who was *mostly* to blame. To say that this is inappropriate for a number of reasons ... doesn't detract from the fact that we all know it happens occasionally and having few guidelines enhances the probability that a [judgment] will be [affected] by the judge's perception of fault. It is also impossible to prove that the economic decision was rendered with fault in mind in [order] to appeal on those grounds. Testimony of Rep. Dore before the Judiciary Committee on March 29, 1989 on L.D. 656 (114th Legis.1989) (emphasis in original).

## II.

### *Res Judicata*

Cameron asserts that the doctrine of *res judicata* bars a tort action brought subsequent to a divorce judgment between the two parties. We disagree.

A prior civil action will bar a subsequent civil claim if:

1) the same parties, or their privies, are involved; 2) a valid final judgment was entered in the prior action; and 3) the matters presented for decision were, or might have been, litigated in the prior action.

*Beegan v. Schmidt*, 451 A.2d 642, 644 (Me. 1982) (quoting *Kradoska v. Kipp*, 397 A.2d 562, 565 (Me.1979)). Clearly the parties are the same and a final divorce judgment was entered.[7]

More difficult is determining whether the matters presented for decision were, or might have been, litigated in the prior action. Although Cameron's conduct could probably have been grounds for a divorce based on cruel and abusive treatment, raising that issue in an action for divorce does not make that action the "same cause of action" as a tort action especially when that action was completely dropped. The New Hampshire Supreme Court has held and we agree that:

Although we have emphasized that 'a change in labels is not sufficient to remove the [preclusive] effect of [a] prior adjudication,' [citation], we think it clear that a civil action in tort is *fundamentally* different from a divorce proceeding, and that the respective issues involved are entirely distinct.

*Aubert v. Aubert*, 129 N.H. 422, 529 A.2d 909, 911 (1987) (emphasis added) (holding that divorce granted on ground of extreme cruelty did not bar husband's subsequent tort action against former wife). An action for divorce, even based on the ground of cruel and abusive treatment, is not based on the same underlying claim as an action in tort:

The purpose of a tort action is to redress a legal wrong in damages; that of a divorce action is to sever the marital relationship between the parties, and where appropriate, to fix the parties' respective rights and obligations with regard to alimony and support, and to divide the marital estate.

*Heacock v. Heacock*, 402 Mass. 21, 520 N.E.2d 151, 153 (1988) (citations omitted).

Furthermore, Maine's substantive divorce law is hostile to a divorce court's consideration of, not to mention determination of, tortious conduct. In divorce actions, the court's inquiry is limited to the determination of a valid basis for divorce. Maine courts are prohibited from considering fault in dividing marital property, *see Eaton*, 447 A.2d at 831, or in awarding alimony, *see Skelton*, 490 A.2d at 1207. Requiring a party to raise tort claims in a divorce action would inject a detailed examination of fault into the litigation; a result the legislature clearly did not intend. In fact, such a requirement would undermine the policy premises of no-fault divorce.

The special procedure involved in divorce actions, which are traditionally equitable in nature, also makes joining tort claims impracticable. The most problematic procedural difference between tort and divorce actions is the right to a jury trial in tort actions that would require bifurcation of at least part of the trial. As one court has expressed:

Resolution of tort claims may necessarily involve numerous witnesses and other parties such as joint tortfeasors and insurance carriers whose interests are at stake. Consequently, requiring joinder of tort claims in a divorce action could unduly lengthen the period of time before a spouse could obtain a divorce and result in such adverse consequences as delayed child custody and support determinations.

7. Cameron also argues that through their settlement agreement, the parties had reached an accord and satisfaction on Henriksen's tort claim. That issue was properly submitted to the

jury, and from the record before us we cannot say that the jury was compelled to find that the parties came to a "meeting of the minds" on the

*Stuart,* 421 N.W.2d at 508.[8]

The *res judicata* question before us today has been considered in a number of other jurisdictions. The majority of courts agree that tort claims are not barred subsequent to a divorce judgment because of *res judicata.* See Andrew Schepard, *Divorce, Interspousal Torts, and Res Judicata,* 24 Fam.L.Q. 127, 130–31 (1990); *see, e.g. Simmons v. Simmons,* 773 P.2d 602 (Colo.App. 1988) (wife's post-dissolution claim for intentional infliction of emotional distress against former husband not barred by *res judicata*); *Waite v. Waite,* 593 So.2d 222 (Fla.App.3d Dist.1991) (same; assault and battery claim); *McCoy v. Cooke,* 165 Mich. App. 662, 419 N.W.2d 44, 46 (1988) (same; assault and battery and intentional infliction of emotional distress claim not barred even when divorce court divided marital property according to parties' fault); *Aubert,* 529 A.2d at 911 (husband's tort claim against former wife for damages caused by her shooting him in the face not barred under *res judicata* by divorce judgment even though divorce granted on basis of shooting incident); *Noble v. Noble,* 761 P.2d 1369 (Utah 1988) (wife's intentional tort claim, including a claim for the intentional infliction of emotional distress, against her former husband was not barred by claim preclusion after divorce action); *Stuart,* 421 N.W.2d at 508–09 (same).

Cameron asserts that the divorce settlement resolved all disputes and grievances arising out of the marriage so that the parties would be free to "get on with their lives." Cameron's interest in finality is better left to statutes of limitations that are specifically intended to reconcile the injured party's interest in compensation with the liable party's interest in a terminal date to possible litigation. *Harvie v. Bath Iron Works Corp.,* 561 A.2d 1023, 1025 (Me.1989). Furthermore, nothing prevented Cameron from including a general release in the divorce settlement agreement. At least in some states, "[s]uch broad general releases seem to be standard operation in sophisticated matrimonial settlement agreements." Andrew Schepard, *Divorce, Interspousal Torts, and Res Judicata,* 24 Fam.L.Q. 127, 154 n. 126 (noting New York practice).

### III.

#### *Statute of Limitations*

 The Superior Court (York County, *Fritzsche J.*) ruled that Henriksen could not recover damages for any physical acts of violence by Cameron because these acts were subject to the two-year statute of limitations for assault and battery. Cameron contends that because the "underlying" claim is barred, Henriksen's claim for intentional infliction of emotional distress is also barred. We disagree.

Nothing in our opinions suggests that a claim for intentional infliction of emotional distress cannot stand as an independent claim. Nor have we suggested that these claims should be limited to the statute of limitations of other tort claims brought simultaneously by a plaintiff. In fact, in an action between former spouses for the intentional infliction of emotional distress and for assault and battery, we used a six-year statute of limitations period to determine what evidence was time-barred. *Caron v. Caron,* 577 A.2d at 1178. The appropriate limitations period for intentional in-

---

issue of accord and satisfaction. *See Rosenthal v. Rosenthal,* 543 A.2d 348, 354 (Me.1988).

**8.** Maine has further procedural restrictions on divorce actions which, although not expressly precluding the joinder of a tort claim, make the two actions incompatible. For example, M.R.Civ.P. 80(b) prohibits all counterclaims in divorce actions except those for "divorce, annulment, separate support, or a determination of parental rights and responsibilities." Additionally, M.R.Civ.P. 80(g) limits discovery to "issues of alimony, support, counsel fees, and disposi-

tion of property" unless by order for good cause shown. Given these limitations, the preclusion of tort claims in a divorce action can be inferred from the structure of M.R.Civ.P. 80. *See Ward v. Ward,* 155 Vt. 242, 583 A.2d 577, 580 (1990) (interpreting Vermont's Rule 80 (virtually identical to Maine's) to preclude tort claims brought in a divorce action); *see also Windauer v. O'Connor,* 107 Ariz. 267, 485 P.2d 1157, 1158 (1971) ("peculiar and special nature of a divorce action speaks against the bringing of [it together with a tort action] in one litigation").

fliction of emotional distress claims is six years, not two. 14 M.R.S.A. § 752 (1980).

## IV.

### Evidence of Physical Abuse

■ Outside of the presence of the jury, Henriksen testified about six assaults and three rapes perpetrated by Cameron. The Superior Court only allowed Henriksen to testify before the jury as to two incidents of physical abuse: a 1986 rape and a 1980 assault. The court instructed the jury that the admission of these incidents was only to show the reasonableness of Henriksen's emotional response to Cameron's threats and to show Cameron's motive and intent with respect to the non-physical conduct. The trial court further instructed the jury not to award damages for those physical acts.[9] Cameron argues that he should be granted a new trial because this time-barred evidence was unduly prejudicial.

First at issue is whether the evidence is beyond the scope of the statute of limitations at all. Henriksen's complaint was filed on April 25, 1989. Therefore, the 1980 incident was clearly beyond the scope of the statute of limitations. The disagreement arises over the 1986 incident. Cameron argues the two-year statute of limitations for assault and battery should bar all evidence of physical abuse. We disagree.

As discussed above, the statute of limitations period for intentional infliction of emotional abuse is six years. Although the two-year limitation bars Henriksen from recovering any damages for the *physical* injury she suffered from the assault and battery inflicted by Cameron; it does not bar her from recovering for *emotional* injuries sustained from those physical assaults occurring within six years of her action. The evidence of physical abuse between 1983–1986, therefore, was not beyond the statute of limitations period and should have been admitted as substantive evidence of her claim.

■ Even though the 1980 assault was beyond the statute of limitations period, the trial court did not abuse its discretion by admitting that evidence. In an action for assault and battery and intentional infliction of emotional distress, we have said that it is sometimes appropriate to admit evidence of conduct occurring beyond the six-year statute of limitations

> for the purposes of establishing the defendant's intent or motivation as well as on the issue of whether or not [the plaintiff] reasonably believed any threats that may have been made by [the defendant].

*Caron,* 577 A.2d at 1180. In the case at bar, the trial court admitted the evidence of the 1980 assault for precisely such purposes. Cameron argues that the admission of the 1980 assault was overly prejudicial. Because Henriksen was prevented from introducing to the jury at least six events of physical abuse occurring between 1983 and 1986 as substantive support for her claim, however, we cannot say that the introduction of the 1980 assault was overly prejudicial to Cameron especially in light of the proper limiting instructions.

## V.

### Dr. Collins' Testimony

Dr. Jerome Collins testified as Henriksen's only expert witness that as a result of Cameron's abusive behavior, Henriksen was suffering from post-traumatic stress syndrome. When asked whether he had consulted with anyone else regarding his diagnosis and treatment of Henriksen, Dr. Collins testified, over objection, that another psychiatrist, Dr. Carlyle Voss, prepared a "diagnostic evaluation" that agreed with his opinion "on virtually all aspects of the case." The trial court admitted this testimony regarding Dr. Voss's report, notwithstanding its hearsay nature, pursuant to M.R.Evid. 703. Two subsequent references to Dr. Voss's report were also admitted:

---

**9.** The Superior Court stated:
 I will also instruct that no damages ... can be awarded for any physical violence at any time, or for any pre-April 25, 1983, incidents of any nature. Again, the purpose would sim-

ply be for the jury to understand ... the reasonableness of her reactions to ... any other incidents they find to be truthful, and his intentions in doing those things.

one on direct examination [10] and one in closing arguments.[11] Cameron argues that Dr. Collins' testimony about the substance of Dr. Voss's opinion was hearsay that should have been excluded and this prejudicial error calls for a new trial. Although we agree that this evidence should have been excluded, we find its admission harmless error. *See* M.R.Civ.P. 61.

■■■ Once the trial court has determined that an expert is qualified to render an opinion relevant to the pending case, it must then determine whether the opinion is based on a proper factual foundation. *State v. Thompson*, 503 A.2d 689, 692 (Me. 1986); *see also* M.R.Evid. 703 & 705. Rule 703 reads in full as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*

(emphasis added). A trial court's decision to admit opinion evidence pursuant to Rule 703 will not be reversed unless it is clearly erroneous. *McLellan v. Morrison*, 434 A.2d 28, 30 (Me.1981).

In the case before us, the parties agreed that Dr. Collins was a "qualified licensed doctor who is qualified and licensed and practices in the area of psychiatry." Dr. Collins' opinion also met the requirements of Rule 703 because it was supported by, among other things, Dr. Voss's report. The report of another physician constitutes "facts or data ... of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." M.R.Evid. 703; *see McLellan*, 434 A.2d at 30 ("In conferring with another medical expert, [the expert witness] was merely following a procedure similar to consulting a medical textbook to obtain a confirmation of his own tentative conclusion.").

■■■ Pursuant to Rule 703, Dr. Collins could testify that he relied on Dr. Voss's report in order to establish the factual foundation necessary for the admissibility of his opinion. Testimony regarding the *substance* of Dr. Voss's report, however, is not necessary to establish factual foundation under Rule 703 and remains hearsay not within any exception. *See* M.R.Evid. 801–804. Rule 703 does not make the substance of Dr. Voss's report admissible and, therefore, admitting Dr. Collins' testimony about the substance of the report was error.

The trial court's error in admitting this evidence, however, was harmless. *See* M.R.Civ.P. 61.[12] From Dr. Collins' testimony that he relied on Dr. Voss's report which was properly admitted, a jury could infer that Dr. Voss's report essentially supported Dr. Collins' opinion. Therefore, the admission of evidence confirming that Dr. Voss agreed with Dr. Collins was cumulative and thus its admission constitutes harmless error not requiring reversal.

The entry is:

Judgment affirmed.

WATHEN, C.J., and ROBERTS and CLIFFORD, JJ., concur.

---

**10.** Later in the direct examination of Dr. Collins the following exchange occurred:

> Q. You've also just spoken, Doctor, about the severity of [Henriksen's] condition, is it possible to quantify, if you will the nature of her emotional distress?
>
> . . . .
>
> Q. Her symptoms?
> A. The degree of the stressors ... I think both Dr. Voss and myself have adjudged those to be severe.... I would concur with his judgment that they're moderate[ ] to severe....
> [Counsel]: Objection ... this is clearly an abuse ... his again and again using Dr. Voss as substantive evidence ...

**11.** In closing arguments, counsel for Henriksen stated: "We know that Dr. Voss, the head of the Maine Medical Psychiatric Unit agrees with, has written a report that confirms everything that Dr. Collins believes." No objection was apparent from the record on appeal.

**12.** M.R.Civ.P. 61 provides in relevant part:

> No error in either the admission or the exclusion of evidence ... is grounds for granting a new trial or setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.

GLASSMAN, Justice, with whom RUDMAN, J., joins, dissenting.

I must respectfully disagree with the Court's decision that the doctrine of *res judicata* does not bar the present action. In the instant case, the matter presented for decision could have been litigated in the prior action for divorce. Contrary to Henriksen's contention, the application of the doctrine of *res judicata* would not unfairly deprive her of a remedy in contravention of Art. I, § 19 of the Maine Constitution, which states: "Every person, for an injury inflicted on the person ... shall have remedy by due course of law...."

The Court today under the guise of the common law of torts intrudes into an area that since the adoption of Maine's Constitution in 1820 has been exclusively within the province of the Legislature. It is from a composite of legislation that the present statutes governing all facets of domestic relations have evolved. *See* 19 M.R.S.A. § 1–1005 (1981 & Supp.1992). A review of that legislation clearly demonstrates that, unlike any other relationship between two adults, the marriage relationship in its creation, in its dissolution, in the determination of the responsibilities imposed, and the rights and the remedies afforded by reason of the existence of the relationship, has been governed by statute throughout the period of Maine's statehood.

The legislation governing the formation of a marriage relationship from 1639 through 1820 is set forth in *Commonwealth v. Munson*, 127 Mass. 459, 460–66 (1879), in which that court expressly repudiated the validity of common law marriages. When the question, "Is a common law marriage valid under the laws of the State of Maine?", was for the first time presented to this Court on certification from the United States District Court, we responded in the negative. *Pierce v. Secretary of the U.S. Dep't of Health, Education and Welfare*, 254 A.2d 46, 48 (Me. 1969). We specifically noted:

> The Massachusetts Court was also of the view that if the law were to be changed to permit a valid marriage to be effectuated "by the mere private contract of the

parties, without going before any one as a magistrate or minister," that should properly be "a matter for legislative, and not for judicial consideration." We are of the same view.

*Id.* (quoting *Munson*, 127 Mass. at 470). *See also State v. Hodgskins*, 19 Me. 155, 159–60 (1841) (proof of adultery dependent on proof that statutory requirements for valid marriage are met); *Ligonia v. Buxton*, 2 Me. 102, 108–09 (1822) (The Resolve of 1821 did not render valid purported marriage solemnized in 1814 by church elder who was not a stated and ordained minister of the gospel within meaning of Me.Stat., ch. 3 (1786). In addition, the court gave no consideration to the possible existence of a common law marriage despite the fact that the parties had cohabited as man and wife for six years.).

Through 1820, the dissolution of the marriage relationship was governed by the March 16, 1786 act of the General Court of Massachusetts, as amended in 1810. *See* Maine Const. Art. X, § 3 ("All laws now in force in this State, and not repugnant to this Constitution, shall remain, and be in force, until altered or repealed by the Legislature, or shall expire by their own limitation."). In February 1821, the Maine Legislature enacted "An Act for regulating Marriage, and for the orderly solemnization thereof" and "An Act regulating Divorces." *See* Smith, *Laws of the State of Maine*, Vol. I, ch. 70, 71, pp. 419–30 (1834). *See also Holyoke v. Holyoke*, 78 Me. 404, 409–10, 6 A. 827, 827–28 (1886) (tracing legislation governing the dissolution of the marriage relationship from 1786 to 1886).

Until 1883, the statute distinguished between those grounds for which the court was authorized to grant a divorce from the bed and board of the other spouse and those for which a complete dissolution of the marriage contract would be effected. In March 1883, the Legislature repealed the former legislation and replaced it with seven of the nine presently existing grounds for divorce and provided that all divorces would effect a complete dissolution of the marriage contract. *See* 19 M.R.S.A. § 691 (grounds and procedure for

divorce).[1] Since 1820, the statutes governing divorce have enabled the court to provide for the support of the divorced wife by authorizing the restoration of certain properties to her, the payment to her of reasonable alimony out of her husband's estate, or the assignment to her of all or a part of the husband's real property or the rents and profits therefrom. Further, the court has been authorized on application of either party to make such adjustments to previously awarded alimony as it deemed necessary. *See* 19 M.R.S.A. §§ 721 to 722–A (governing alimony and disposition of property).

Coextensive with legislation governing the formation and dissolution of the marriage relationship, legislation was enacted governing the legal rights of married women external to the relationship itself. An exhaustive discussion of the progress of that legislation from 1821 to 1898 may be found in *Haggett v. Hurley*, 91 Me. 542, 551–553, 40 A. 561, 564–65 (1898). The retention of much of that legislation together with interim legislation specifically addresses the present rights of married *persons*. *See* 19 M.R.S.A. §§ 161 to 167–A.[2] It is against this background of almost two centuries of extensive and comprehensive legislation and our application of that legislation that the issues presented by the record in the present case must be determined.

The record here reflects the following pertinent facts: On April 26, 1989, Henrik-sen filed the present complaint against Cameron seeking damages from him for injuries sustained by Henriksen for Cameron's alleged intentional infliction on her of emotional distress from approximately 1974 to 1989. In his answer, Cameron pleaded as an affirmative defense that the doctrine of *res judicata* barred Henriksen's claim. On September 4, 1990, Cameron filed a motion for a summary judgment. At the hearing on that motion, the court had before it the depositions of the parties establishing that the alleged conduct giving rise to the complaint had occurred in the period from the date of their marriage in 1974 to their separation in September 1986. In October 1986, Henriksen had filed an action against Cameron seeking a divorce from Cameron on the ground of cruel and abusive treatment, an award of alimony and his payment of her attorney fees and costs.

The divorce action was set for trial for April 20, 1988. On that date, the court was advised that the parties had reached a property settlement agreement contingent on Henriksen's receipt of a loan commitment within 30 days. Henriksen sought leave to amend her complaint to include the ground of irreconcilable differences and to proceed on that ground, stating, "[b]ut I don't want to dismiss the ground of cruel and abusive treatment and if the agreement as outlined does, in fact, break down, I want those grounds of divorce to be alive...."[3] After securing the consent of

---

1. By P.L.1973, ch. 532, the Legislature amended 19 M.R.S.A. § 691 to provide irreconcilable marital differences as an additional ground for divorce. By P.L.1977, ch. 465, the Legislature further amended section 691 to provide mental illness requiring confinement in a mental institution for at least 7 consecutive years prior to the commencement of the action as the ninth ground for divorce.

2. *See also* 14 M.R.S.A. § 6051(9) (1980) (The Superior Court shall have equity jurisdiction "[t]o hear and determine property matters between wife and husband or husband and wife as provided in Title 19, section 166....").

3. As noted previously in this opinion, the Legislature amended 19 M.R.S.A. § 691 to provide as an additional ground for divorce the so-called "no fault" ground, when "marital differences are irreconcilable and the marriage has broken down." P.L.1973, ch. 532 (effective Oct. 3, 1973). We were first called on to apply this legislation in *Mattson v. Mattson*, 376 A.2d 473 (Me.1977), in which the finding of the trial court as to the ground for divorce was challenged. In distinguishing the ground of irreconcilable differences from other enumerated grounds for divorce, we stated:

> The necessity of a breakdown in the marriage is a legislative substitute for a required finding of fault in one of the parties in a divorce action.... Just as the fault of one partner must exist whenever a divorce is granted on any other grounds, a breakdown in the marriage must necessarily exist if the court finds the required degree of irreconcilable difference on which to premise granting a divorce.

*Id.* at 476 [citations omitted].

Cameron to this condition, the court granted the amendment and heard Henriksen's testimony which included the terms of the property settlement between the parties. Both parties advised the court of their agreement with the terms and accuracy of the property settlement as set forth in her testimony. Cameron offered no other evidence on his behalf. The court then stated that the matter had been heard *de bene esse*.[4]

On June 26, 1988, the court issued its judgment of divorce on the ground of irreconcilable differences. Pursuant to the terms previously presented to the court, the judgment provided for the distribution of the marital personality; that Cameron would by deed release to Henriksen all his interest in the marital real property of the parties; that Henriksen would hold Cameron harmless for any obligations on said property and pay to him the sum of $389,-000, with $30,000 to be paid on or before August 25, 1988, and the remainder by annual payments of $10,000 together with interest. Although the April 20 hearing did not address these issues, the judgment further provided that neither party pay alimony, separate support or maintenance to the other and that each party would be responsible for that party's attorney fees and costs incurred in the proceeding. Neither party appealed from this judgment.

Although the trial court in the present proceeding recognized that the issue presented had not yet been addressed by this Court, it rejected Cameron's contention that because Henriksen's claim against him could have been litigated in the earlier divorce action, it was barred by the doctrine of *res judicata*. The court, *inter alia*, stated:

[T]he court recognizes the well settled view in Maine that marital fault is an inappropriate consideration in the distribution of marital property. [citation] The issue of defendant's alleged tortious conduct, therefore, was never properly before the court in the divorce hearing, nor should it have been. Thus, the tort claims are not barred by the doctrine of res judicata.

I agree with the trial court that "marital misconduct" is an inappropriate consideration in the distribution of marital property pursuant to 19 M.R.S.A. § 722-A. *See Boyd v. Boyd*, 421 A.2d 1356, 1357–58 (Me. 1980).[5] I disagree, however, with the trial court and with this Court that Henriksen's claim of the willful infliction of emotional distress could not have been presented to the trial court in the context of the divorce proceedings and, therefore, is not barred by the doctrine of *res judicata*. The law is well established that Henriksen's present claim could have been presented had she not chosen to abandon her claim of cruel and abusive treatment as the ground for the divorce she sought.[6]

In *Holyoke*, 78 Me. at 404, 6 A. at 827, three years after the 1883 legislation specifying particular grounds for the dissolution of the marriage relationship, we were called on to determine for the first time what conduct constitutes cruel and abusive treatment within the statute. The husband in that divorce action had based his claim of cruel and abusive treatment on the conduct of his wife throughout their marriage relationship that included repeatedly charging him with incidents of infidelity in the

---

4. *Black's Law Dictionary*, 5th ed. 1979, defines *de bene esse* as "proceedings which are taken provisionally and are allowed to stand ... for the present, but which may be subject to future exception or challenge, and must then stand or fall according to their intrinsic merit and regularity."

5. It should be noted that in *Boyd* we distinguished between "marital misconduct" and "financial misconduct" occurring in the course of the marriage and did not foreclose consideration of the latter in dividing marital property. 421 A.2d at 1358. The effect of "financial misconduct," if any, on the division of marital property has yet to be determined by this court. *Cf.* 19 M.R.S.A. § 721(M) (Supp.1992) (Court shall consider "[e]conomic misconduct by either party resulting in the diminution of marital property or income" when determining award of *alimony* (emphasis added)).

6. The entire thrust of Henriksen's claim in the present action is based on the impairment of her mental health by reason of Cameron's treatment of her during the course of their marriage. The conduct on which she relies is specified in footnote 1 and part IV of the court's opinion.

presence of their two minor children and their servant and circulating those charges to friends and acquaintances; frequently calling him a liar and a whoremaster and words of similar import in front of their children and their servant; otherwise avoiding him and refusing to speak to him; occupying a bed by herself and refusing to cohabit with him; and demonstrating a complete lack of concern for his happiness or welfare. All of which, he claimed, so affected his peace of mind and feelings as to affect his health and endanger his health in the future. We determined that cruel and abusive treatment are words of comprehensive meaning not necessarily implying physical violence though it may include it. "Temperament and character so widely differ, that conduct cruel to one, might scarcely annoy a more callous nature.... *each particular case must be judged of by its own particular facts and circumstances.*" *Id.* at 410, 6 A. at 828 (emphasis added).

Accordingly, whatever treatment is proved in each particular case to seriously impair, or to seriously threaten to impair, either body or mind is cruel and abusive treatment within the meaning of that statutory ground for divorce. This definition has persisted to the present. *See, e.g., Leach v. Leach,* 8 A. 349, 350 (Me.1887) (fact that husband had loathsome disease before marriage and intentionally withheld fact from wife and knowledge of fact when brought home to her was calculated to make her miserable, cause her mental pain, anguish and suffering to such degree as to endanger her life or health or cause reasonable apprehension thereof, constitutes cruel and abusive treatment within meaning of statute); *Michels v. Michels,* 120 Me. 395, 397, 115 A. 161, 161 (1921) (husband's willful and unjustified attempt to commit wife to mental institution thereby seriously affecting her health is cruel and abusive treatment within meaning of statute); *Bond v. Bond,* 127 Me. 117, 131–32, 141 A.

833, 839 (1928) (husband's motive or intent to cause wife mental pain presumed if husband knows or should have known effect of his treatment of her); *Gruber v. Gruber,* 161 Me. 289, 292, 211 A.2d 583, 585 (1965) ("It must be affirmatively shown by the plaintiff in a divorce action [on ground of cruel and abusive treatment] that the acts complained of caused a consequential effect of an impairment of physical or mental health or an apprehension of danger to life."); *Cellucci v. Cellucci,* 522 A.2d 1318, 1319 (Me.1987) ("[E]vidence [of incompatibility] in this record is clearly inadequate to establish cruel and abusive treatment by the wife under the standard set forth in *Gruber.*").

Nor can I agree with this Court's statement that in the context of a divorce proceeding, no compensatory relief could be provided Henriksen for her claimed injury. At the time the divorce proceeding between Henriksen and Cameron was pending before the trial court, the statute governing the authority of the court to provide for alimony stated in pertinent part:

> The court may decree to either spouse reasonable alimony out of the estate of the other spouse, having regard to that spouse's ability to pay and may order that spouse to pay sufficient money for the defense or prosecution of hearings regarding alimony. To effect the purposes of this section, the court may order so much of one spouse's real estate, or the rents or profits thereof, as is necessary to be assigned or set out [to] the other spouse for life. The court may order instead of alimony, a specific sum to be paid or to be payable in such manner and at such times as the court may direct. The court may at any time alter, amend or suspend a decree for alimony or specific sum when it appears that justice requires it....

19 M.R.S.A. § 721 (1981).[7] It is a well-established principle that this section vests

---

7. As originally appearing in the 1964 revision, this section read:

> When a divorce is decreed for impotence, the wife's real estate shall be restored to her, and the court may enter judgment for her

against her husband for so much of her personal property as came to him by the marriage, or its value in money, as it thinks reasonable; and may compel him to disclose, on oath, what personal estate he so received, how

the trial court with broad powers to order one spouse to pay alimony to the other and to determine the amount of that alimony, its source, duration and the method of payment. *Torrey v. Torrey*, 415 A.2d 1092, 1094 (Me.1980).[8] Moreover, section 722–A governing the division of property was not intended to abrogate or limit the discretion of the trial court to determine the amount of alimony as justice may require. *See Smith v. Smith*, 419 A.2d 1035, 1039 (Me. 1980) ("The fact that in the same measure that enacted section 722–A the legislature amended section 721 without any provision limiting the source of funds from which alimony may be derived, is strong evidence [that the legislature intended to leave the determination of alimony solely within the discretion of the court].").

In determining alimony, the trial court must consider a multitude of factors, including each party's age and health. *See Cole v. Cole*, 561 A.2d 1018, 1021 (Me. 1989). *See also* 19 M.R.S.A. § 721(1)(I) (Supp.1992) (court shall consider health and disabilities of each party when determining alimony). The fact that a spouse may be able to be self supporting does not foreclose an award of alimony when evidence discloses a serious medical condition. *See Dunning v. Dunning*, 495 A.2d 821, 823 (Me.1985). *See also Pongonis v. Pongonis*, 606 A.2d 1055, 1059 (Me.1992) (alimony may be appropriate in consideration of wife's serious medical condition notwithstanding her past uninterrupted flow of income sufficient to support herself). Thus, a review of the legislative history of section 721 and our application of that section casts considerable doubt on the accuracy of the Court's statement in the present case that "[w]e have also held that fault could not be considered in alimony determinations." [9]

---

it has been disposed of and what then remains. When a divorce is decreed to the wife for the fault of the husband for any other cause, she shall be entitled to 1/3 in common and undivided of all his real estate, except wild lands, which shall descend to her as if he were dead; and the same right to a restoration of her real and personal estate, as in case of divorce for impotence.

The court may decree to her reasonable alimony out of his estate, having regard to his ability, and sufficient money for her defense or prosecution of hearings affecting alimony; and to effect the purposes aforesaid, may order so much of his real estate or the rents and profits thereof, as is necessary, to be assigned and set out to her for life; or, instead of alimony, may decree a specific sum to be paid by him to her or payable in such manner and at such times as the court may direct; and the court may at any time alter, amend or suspend a decree for alimony or specific sum when it appears that justice requires; and use all necessary legal processes to carry its decrees into effect.

19 M.R.S.A. § 721 (1964), *repealed in part by*, P.L.1971, ch. 399, § 1, *repealed and replaced by*, P.L.1977, ch. 564, § 86.

In 1971, the Legislature repealed the first paragraph of the 1964 version and simultaneously added to Title 19 a new section 722–A governing the disposition between the parties of their separate and marital property. P.L.1971, ch. 399, § 2. Then, in *Beal v. Beal*, 388 A.2d 72, 75 (Me.1978), we held that because section 721 subjected men and not women to alimony claims, it unconstitutionally denied males the equal protection of the law. By the time that case was decided, however, the Legislature had replaced section 721, making either spouse eligible for alimony. P.L.1977, ch. 564, § 86. Section 721 was further amended in 1979 to clarify the court's authority to award and alter alimony. P.L.1979, ch. 424, §§ 1 & 2.

Again, in 1989, the Legislature repealed and replaced section 721. P.L.1989, ch. 250, § 1 (effective January 1, 1990). The statement of facts attached to Committee Amendment "A" of L.D. 656 (the version enacted) states: "Th[is] bill and amendment do not remove the discretion of the court when determining alimony; the factors serve as guidelines to the parties, the court, and any reviewing court, should a decree be appealed."

8. We will find an abuse of the trial court's broad discretion in determining the amount of alimony only if there exists a plain and unmistakable injustice so apparent as to be instantly visible without argument. *Sweeney v. Sweeney*, 556 A.2d 660, 661 (Me.1989). *See also Prue v. Prue*, 420 A.2d 257, 259 (Me.1980) (same standard of review for an award "in lieu of alimony").

9. In *Skelton v. Skelton*, 490 A.2d 1204 (Me. 1985), on which the court relies, we vacated an award of alimony to the wife and remanded the case for redetermination of the alimony award. In the judgment granting a divorce to the parties on the ground of irreconcilable differences, the trial court awarded alimony to the wife on the stated ground that it "will compensate [wife] in the only practical way, under the circumstances, for her long service as spouse and homemaker." We held that "the extent of the wife's contribution to the marriage is relevant

In the instant case, the record discloses that Henriksen first experienced the symptoms from which she presently suffers sometime after Labor Day in 1986 and prior to filing the action for divorce. She consulted her psychiatrist, Dr. Collins.[10] As of November 5, 1986, approximately 17 months prior to a hearing on Henriksen's action for divorce, Dr. Collins diagnosed her condition as a post traumatic stress disorder that in his opinion was causally connected with Cameron's treatment of her in the course of the marriage relationship.[11] Henriksen has continued with the services of Dr. Collins with a varying degree of regularity. The nature of the disorder and its effect on Henriksen was fully described by both Henriksen and Dr. Collins. Dr. Collins testified as to the medication he had prescribed for Henriksen and the necessity for her continuing with that medication for an indefinite period of time in the future. He also testified as to the necessity of Henriksen continuing with psychiatric treatment for an indefinite period in the future, with the frequency of such treatment to be largely governed by "occurrences of crises or changes of events that may incite symptoms because of their symbolic connections with past events" that had occurred in the marriage relationship with Cameron. The past and future cost of psychiatric care was demonstrated by Dr. Collins's billing to Henriksen. Henriksen's age and life expectancy was established. There were also other witnesses who testified to Cameron's treatment of Henriksen during the course of their marriage and the effect of such treatment on Henriksen.

Thus, the operative facts forming the basis of the present action are the same as those that Henriksen had an opportunity to litigate had she pursued her action for divorce on the ground of cruel and abusive treatment. The argument that she should not be barred from bringing this present action because the remedy she now seeks—damages—is different from the remedy that could have been afforded her—alimony or a "specific sum to be paid or payable in such manner and at such time as the court may direct"—is without merit. We have accepted the modern principles of *res judicata* that a party's claim cannot be split by first seeking one type of remedy in one action and later asking for another type of relief in a second action.[12] *See*

not to an award of alimony under 19 M.R.S.A. § 721 (1981), but to a disposition of property under 19 M.R.S.A. § 722–A (1981)." *Id.* at 1208 (quoting *Baker v. Baker*, 444 A.2d 982, 984 (Me. 1982)). We carefully noted, however, that our holding did not mean that the effect of the wife's fifteen years of service was irrelevant to the assessment of the need for alimony. We reaffirmed that this "assessment is an individual one in every case, 'giving regard to the situation both at present and for the foreseeable future, of both spouses.'" *Id.* (quoting *Bryant v. Bryant*, 411 A.2d 391, 395 (Me.1980)). We further stated that "[i]t is in the discretion of the trial court to determine whether the situation of one spouse requires an award of alimony from the other." *Id.*

10. Henriksen had previously consulted Dr. Collins once in 1980 and once in 1982.

11. It should be noted that in the course of the trial of the present case, on the ground of the statute of limitations, Henriksen was prevented from offering evidence as to certain incidents occurring during the marriage relationship of Cameron's cruel and abusive treatment of her that both she and her treating physician opined has a causative connection with or had exacerbated the medical condition of which she complained. A review of the cases makes clear that

in the context of a divorce proceeding on the ground of cruel and abusive treatment such evidence would not have been foreclosed on that ground. *See Holyoke*, 78 Me. at 411–12, 6 A. at 829. *See also* P.L.1971, ch. 194 (codified in 19 M.R.S.A. § 691 (1981)) ("[C]ondonation of the parties shall not be an absolute defense to any action for divorce but shall be discretionary with the court") and P.L.1971, ch. 195, § 2 (codified in 19 M.R.S.A. § 691 (1981)) ("[r]ecrimination shall be a comparative rather than an absolute defense in any divorce action.").

12. The Court in its reliance on *Caron v. Caron*, 577 A.2d 1178 (Me.1990), fails to fully disclose the posture of that case and the issues as presented to us. The most decisive and differentiating factor between *Caron* and the present case is that in *Caron* the defendant did not affirmatively plead the bar of *res judicata*, as required by M.R.Civ.P. 8(c), to the relitigation of all or any part of the plaintiff's claim that was based on his treatment of her in the course of their marriage. In addition, in *Caron* the plaintiff's action for assault, battery and the intentional infliction of emotional distress in connection with the defendant's abusive treatment of her focused on an incident of the defendant's violent physical conduct toward her that occurred two years after the parties' divorce. As a result

*Kradoska v. Kipp,* 397 A.2d 562, 567 (Me. 1979). *See also Roy v. City of Augusta, Maine,* 712 F.2d 1517, 1521 (1st Cir.1983); *Restatement (Second) of Judgments,* §§ 24 & 25 (1982).

It is an accepted principle that the involvement of public policy is present in the unique relationship of marriage to a degree not known in any other form of relationship between two adults. This is evidenced by the careful and specific legislation that has governed the marriage relationship for almost two centuries. The authority of the courts to deal with the intentional treatment of one person directed to the other in the course of marriage and the responsibilities, rights and remedies that may flow from that treatment, has always been confined within the parameters of that schematic legislation.

By its decision today, the Court has dramatically injected a cause of action for the common law tort of the intentional infliction of emotional distress into a carefully constructed scheme of legislation governing the marriage relationship.[13] Such a sweeping embellishment of the existing law governing the marriage relationship should be left to the Legislature. Inherent in the Court's opinion are a number of policy decisions that can be soundly made only after an opportunity for public debate. That debate should be conducted free of the court's view as to the better policy. The Legislature, unlike the courts, is institutionally equipped for such a forum. It has the ability for exhaustive gathering of socio-economic facts implicit in the making of what is essentially a political judgment; whether Maine should have a cause of action not vulnerable to the application of the doctrine of *res judicata,* for the intentional infliction of emotional distress based on one person's treatment directed to the other in the course of their marriage. I believe "the elected legislature, directly accountable to the citizens of Maine, is far better situated to make [that judgment] than is the unelected judiciary." *Durepo v. Fishman,* 533 A.2d 264, 265 (Me.1987).

I would vacate the judgment in the instant case and remand the matter to the Superior Court with instructions to grant a summary judgment to Cameron on the ground that the doctrine of *res judicata* bars the present action.

of that conduct, the plaintiff had suffered a permanent, disabling knee injury and had also developed post-traumatic stress syndrome. During the trial she also adduced evidence of certain incidents occurring in the course of the parties' marriage. By his appeal to this Court, however, the defendant, as he had before the trial court, confined his challenge to two issues: (1) the court's admission of certain evidence over his objection that the evidence concerned acts beyond the scope of the statute of limitations and (2) the sufficiency of the evidence to support an award to plaintiff of punitive damages. Clearly, on the record and issues presented to us, we had no obligation to "question" unchallenged evidence, nor could our decision have rested on defenses not raised by the defendant.

**13.** *MacDonald v. MacDonald,* 412 A.2d 71 (Me. 1980), cited as support for Henriksen's claim in the present action, did not involve conduct integrally a part of the marital relationship. Rather, in *MacDonald,* which was a consolidated appeal, the actions sought damages resulting from the negligent operation of a motor vehicle by one spouse—conduct wholly independent of and not directed toward one spouse's treatment of the other in the course of their marital relationship.