2000 ME 43

**STATE of Maine**

v.

**Jose P. MARQUES.**

Supreme Judicial Court of Maine.

Argued Feb. 7, 2000.
Decided March 7, 2000.

---

Stephanie Anderson, District Attorney, Julia A. Sheridan, Asst. Dist. Atty., (orally), Portland, for State.

Thomas F. Hallett, (orally), Thomas F. Hallett Law Offices, P.A., Portland, for defendant.

Before WATHEN, C.J., and
CLIFFORD, RUDMAN, DANA,
SAUFLEY, ALEXANDER, and
CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Jose P. Marques appeals the judgment of conviction entered in the Superior Court (Cumberland County, *Bradford, A.R.J.*) on charges of manslaughter; operating under the influence; eluding an officer; operating after suspension; passing a roadblock; reckless conduct with the use of a dangerous weapon; and criminal speeding. Marques contends on appeal that the court erred in excluding certain expert testimony and in polling the jury. We affirm.

## I. BACKGROUND

[¶ 2] On the evening of May 17, 1997, the appellant, Jose P. Marques, met Michelle Theriault and Teresa Liston at a bar located in Portland's Old Port section. All three had been drinking throughout the evening. Liston testified that she and Theriault had each consumed seven or more mixed drinks. Marques testified to having about eight beers and a shot. According to Liston, the trio left the bar at approximately 11:30 P.M. and entered a red Chevrolet Camaro parked in the narrow cobblestone alleyway directly outside the bar.

[¶ 3] John O'Malley, a patrolman with the Scarborough Police Department, testified that at approximately 1:00 A.M. on May 18, he and Officer Tim Barker were parked in their patrol cars in a parking lot on Route 1 in Scarborough. They observed a red Camaro travelling southbound at between 55 and 59 miles per hour in a 35 mile per hour zone. The two policemen pursued the Camaro with their blue lights on and with O'Malley in the lead. The Camaro did not stop, but slowed to roughly 35 miles per hour and turned into the parking lot for Scarborough's municipal offices. According to O'Malley, the Camaro slowed to about 10 or 15 miles per hour as it drove to the end of the access lane for the parking lot, executed a 180 degree turn around a raised island, and accelerated rapidly. O'Malley testified that when the Camaro was executing the u-turn, he could see directly into the driver's side window. According to O'Malley, he was able to see a man in the driver's seat with dark hair and a dark complexion, whom he later described to the dispatcher as a Hispanic male. On its way through the parking lot, the Camaro next had to execute a sharp right-hand turn. O'Malley, still following close behind, came up almost perpendicular to the passenger side and was able to see a blond woman in the passenger seat.

[¶ 4] Officer Barker testified that he entered the municipal lot shortly after O'Malley and positioned his cruiser in such a way as to block the Camaro's exit from the parking area. The exit lane was too wide for Barker's cruiser to block entirely, and the Camaro managed to edge out around it. As it did so, the Camaro's driver's side window passed by the cruiser's driver's side window. Officer Barker testified that he could see into the Camaro and observed a Hispanic male with a dark colored shirt in the driver's seat and a "peroxide blond" with a white jacket in the passenger seat. The Camaro then accelerated toward the parking lot's exit to Route 1.

[¶ 5] Sergeant Grovo of the Scarborough Police Department arrived on the scene at the municipal lot as the Camaro was driving around Barker's cruiser. Grovo positioned his cruiser at the head of the juncture of the access road and Route 1 to create a "stationary roadblock" with "just enough room for one vehicle to exit" between the front of the cruiser and the curb. The Camaro drove straight at Grovo's cruiser and, at the last moment, swerved and drove past the front of the cruiser within inches of its bumper. As it did, the cruiser's lights shone directly on the side of the Camaro and Grovo testified that he saw a "Hispanic-looking male" operating the car and a bleached blonde in the passenger seat.

[¶ 6] The State also called Michael Carleton, who lives across the street from the municipal lot and had returned home at about the same time as Marques pulled into the municipal lot. He testified that his attention had been drawn to the sound of sirens and that he watched as the officers attempted to corral a red Camaro in the municipal parking lot. According to Carleton, when the Camaro exited the lot he was able to see into the vehicle and observed a "dark-haired individual driving the car with dark clothes" and a female "passenger with a light-colored top on and blonde hair or light-colored hair."

[¶ 7] The officers testified that they followed the Camaro on Route 1 at speeds well over 100 miles per hour. Approximately four miles into the chase, the Camaro missed a turn, caught an asphalt curb with its right rear wheel, and, according to O'Malley, "exploded" into a "huge ball of dust." Sergeant Grovo described seeing the Camaro strike a utility pole, at which point the transformer on the pole exploded and wires fell to the ground.

[¶ 8] O'Malley stopped his cruiser, ran to the crumpled wreckage, and found the Camaro empty with its windows blown out. O'Malley walked in concentric circles around the car until he found Marques on the ground, some 50 or 60 feet from the vehicle. All three officers made in-court identifications of Marques as the man they had seen driving the Camaro. The Officers eventually located Theriault's body suspended approximately 40 feet up in a large pine tree. Marques's blood alcohol content was determined to be 0.15 percent. Theriault's blood alcohol content was 0.25 percent.

[¶ 9] Marques testified in his own defense denying that he had been driving the Camaro during the high speed chase and immediately prior to the crash. Marques also called Thomas Bohan, Ph.D., a forensic physicist and accident reconstructionist, who had conducted an "automobile autopsy" in an effort to find, among other things, evidence of who had been driving the Camaro at the time of the crash. Bohan had found a red stain on the driver's side airbag that he sent to a Connecticut laboratory for analysis. The lab results indicated that the red mark was neither blood nor paint, but was "consistent with a polymeric substance." Shortly before trial, Bohan spoke with the lab technician on the phone and was informed that the polymer was "consistent with cosmetics."

[¶ 10] The State objected to Bohan testifying about the cosmetic composition of the red stain.[1] The court ruled, over Marques's objection, that Bohan could testify that the substance was neither blood nor paint, but not that it was a polymer consistent with cosmetics. Bohan testified extensively about the nature and extent of the "autopsy" he conducted on the Camaro wreckage. At the close of direct examination, Marques's counsel asked whether Bohan had been able to determine, in his expert opinion, where the occupants of the vehicle were seated prior to impact. Bohan testified that he was not able to make such a determination.

[¶ 11] The jury convicted Marques on all counts. After the foreperson announced the verdict, Marques requested that the court poll the jurors individually pursuant to M.R.Crim. P. 31(c). In response, the court polled the jurors, asking each juror for each count, "Is the verdict as recorded your true verdict," "Has the clerk recorded your true verdict," or "Has the clerk correctly recorded your verdict." Each juror individually responded "yes" to all counts. The court then asked Marques's counsel whether there was "anything further by way of inquiry of this panel as to the verdicts that they have returned, either as to the form of the inquiry by the Court or any other inquiry of any nature?" Counsel responded that there was nothing further to address. No objection was stated regarding the poll questions.

## II. M.R. EVID. 703

[¶ 12] Marques contends that it was error for the court to exclude Bohan's testimony that he had been advised that the red substance found on the driver's side airbag was consistent with cosmetics. He asserts that M.R. Evid. 703 allows an expert to testify regarding the content of hearsay communications where it is the kind of hearsay that an expert customarily relies on in his or her field.

1. Marques had previously introduced testimony intending to establish that Theriault was wearing blush on the night in question.

[¶ 13] Rule 703 of the Maine Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■■■ [¶ 14] Pursuant to Rule 703, an expert witness may rely upon the hearsay communications of other experts to establish the foundation for his or her opinion. *See Henriksen v. Cameron*, 622 A.2d 1135, 1144 (Me.1993) (holding psychiatrist could testify about reliance on another psychiatrist's report to establish the factual foundation necessary for the admission of his opinion); *State v. Flint H.*, 544 A.2d 739, 743 (Me.1988) (holding physician's reliance on consultations with pharmacist and gastroenterologist was proper); *McLellan v. Morrison*, 434 A.2d 28, 30 (Me.1981) (holding physician's reliance, in part, on facts divulged in phone conference with neurosurgeon was proper). Testimony regarding the substance of hearsay communications is not necessary to establish a factual foundation for the expert's opinion and remains hearsay under the rules of evidence.[2] Thus, in *Henriksen* we stated that:

> Pursuant to Rule 703, [the expert witness] could testify that he relied on [another expert's] report in order to establish the factual foundation necessary for the admissibility of his opinion. Testimony regarding the *substance* of [another expert's] report, however, is not necessary to establish factual foundation under Rule 703 and remains hearsay not

within any exception.... Rule 703 does not make the substance of [another expert's] report admissible and, therefore, admitting [the expert witness's] testimony about the substance of the report was error.

*Henriksen*, 622 A.2d at 1144.[3]

[¶ 15] Reviewing the current state of the law, Field & Murray states:

> Rule 703, by permitting an expert's opinion and testimony to be based on inadmissible facts and data, does not ipso facto make those facts and data admissible at the behest of the proponent of the opinion....
>
> An expert opinion does not become the vehicle to convey inadmissible hearsay evidence into the trial for direct consideration and analysis by the jury. Unless the door is opened, hearsay facts and data remain inadmissible and should not be disclosed to the jury.

Field & Murray, *Maine Evidence*, § 703.2 at 371 (2000 ed.) (citation omitted). *See also State v. Vining*, 645 A.2d 20, 20–21 (Me.1994) (State medical examiner should not have been allowed to testify that a death was a homicide where conclusion was based on hearsay discussions with police investigators and not a product of her expertise); *Patey v. Lainhart*, 977 P.2d 1193, 1200 (Utah 1999) ("Rule 703 cannot be used to introduce evidence through an expert for purposes other than the expert's conclusions and thus circumvent other rules of evidence.").

■■■ [¶ 16] We agree with Marques that an accident reconstructionist or forensic physicist may rely on hearsay communications with a forensic chemist to form the factual basis of his expert opinion. However, the court properly excluded the substantive evidence contained in the lab report and the analyst's subsequent com-

---

2. *See* M.R. Evid. 705(a), which states:

(a) **Disclosure of Underlying Facts.** The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise.

The expert may in any event be required to disclose the underlying facts or data on cross-examination.

3. The error in allowing the hearsay was held to be harmless. *Id.*

munication with Bohan. Rule 703; by permitting expert testimony based on inadmissable evidence, does not make the substance of that evidence admissible by the proponent of the expert. Further, because Bohan testified that he did not have an opinion about who was driving the Camaro, admission of the evidence in question would have served no purpose other than to circumvent the hearsay rule.[4]

## III. JURY POLL

[¶17] Marques also argues that the court committed obvious error, M.R.Crim. P. 52(b),[5] by failing to poll the jury in a manner that would elicit a "guilty" or "not guilty" response from each juror and by using improper polling questions. With respect to the form of the questions, Marques argues that it is nonsensical to ask a juror whether the clerk has correctly recorded his or her verdict: (a) because the clerk had not yet recorded the verdict; and (b) because the jurors, in any event, would not know what the clerk had recorded.

[¶18] Rule 31(c) of the Maine Rules of Criminal Procedure provides:

When a verdict is returned and *before it is recorded* the jury shall be polled at the request of any party or upon the Court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

M.R.Crim. P. 31(c) (emphasis added). The purpose of juror polling is "to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *State v. Neron*, 519 A.2d 197, 200 (Me. 1986) (quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958)).

[¶19] In *State v. White*, 473 A.2d 883 (Me.1984), the clerk began polling the jurors by asking, "Did you find the defendant guilty?" *Id.* at 883. The court interrupted and told the clerk to ask whether each juror had found the defendant guilty or not guilty or whether the foreman had correctly reported the verdict. *See id.* As a result the clerk asked the jurors, "Did the foreman correctly report the verdict of the jury?" *Id.* Like this case, no objection was made at trial and the standard of review was for obvious error. *See id.* We criticized the method of polling the jury, however, we refused to vacate the conviction on an obvious error standard. We emphasized that polls should be conducted to require a juror to respond with a "guilty" or "not guilty" response. *See id.*

[¶20] Marques argues that his case is distinct from *White* because it involved nine separate counts and a verdict form with sixteen questions for the clerk to review with each juror. Thus, Marques contends that the risk of juror confusion was great enough in his case that he was deprived of a substantial right. The State responds that all nine counts really focus on a single factual determination: whether Marques was driving the Camaro. In fact, Marques's counsel opened and closed by telling the jury that the only issue in the case was whether Marques was driving.

---

4. Marques suggests Bohan was actually prepared to give an opinion that Theriault was driving the Camaro until the court excluded testimony about the cosmetic substance found on the airbag. Thus, according to Marques, the court's ruling deprived him of his primary defense. We find this suggestion unpersuasive. An expert may state an opinion even if the expert cannot state all the reasons for the opinion. *See Henriksen*, 622 A.2d at 1144; M.R. Evid. 705(a).

5. Marques concedes that he failed to preserve this issue with a timely objection. Rule 52(b) states:

(b) **Obvious Error.** Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

M.R.Crim. P. 52(b); *see also State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994); *State v. True*, 438 A.2d 460, 467–69 (Me.1981) (discussing the obvious error standard generally).

[¶ 21] Although the complexity of a case may be a factor for determining whether an unclear jury poll deprived a defendant of a substantial right, the proper standard remains whether the trial court could justifiably conclude that each juror voluntarily assented to the verdict.

[¶ 22] On an obvious error standard of review, we will vacate a conviction only if the obviousness of the error and the seriousness of the injustice done thereby are so great that we cannot in good conscience let the conviction stand. *See State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994) (quoting *State v. True* 438 A.2d 460, 469 (Me.1981)). Marques cannot meet this standard because the record does not reflect that the jury failed to appreciate the purpose or meaning of the polling question. Although the question asked of the jurors was technically flawed, the record reflects no confusion on the part of the court, counsel, or the jury.[6] In these circumstances counsel must, by objection, call the court's attention to any improper poll question and afford the court the opportunity to correct the problem while the jury is present. The trial court's error in stating the jury poll questions was not obvious and does not justify vacating the conviction.

## IV. OTHER ISSUES

[¶ 23] Marques also challenges the court's denial of his post-trial motion to vacate or dismiss the judgment or to grant a new trial. In addition to the foregoing issues, Marques claims the existence of both a *Brady* violation and newly discovered evidence. We do not address these arguments separately because the evidence supporting Marques's motion falls far short of calling the defendant's guilt into question. *See State v. Rich*, 592 A.2d 1085, 1088–89 (Me.1991) (holding that pursuant to M.R.Crim. P. 16(a)(1)(C), automatically discoverable information includes only information that " 'tends to create reasonable doubt of the defendant's guilt,' not information leading to a witness who might provide exculpatory testimony"); *Strickler v. Greene*, 527 U.S. 263, ——, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *State v. De-chaine*, 630 A.2d 234, 236 (Me.1993) (holding that newly discovered evidence must reveal that "in light of the overall testimony, new and old, another jury *ought* to give a different verdict").

The entry is:

Judgment affirmed.

---

**6.** The Supreme Court of Utah, for instance, reviews the issue of unanimity as a factual question and on a clearly erroneous standard, "granting some deference to the trial judge, because a 'trial judge, in determining whether a juror has freely assented to the verdict, not only hears the juror's responses, but observes the juror's demeanor and tone of voice during the course of the polling of the jury." ' *State v. Heaps*, 2000 UT 5, 2000 WL 14998, at *3, —— P.2d ——, —— (Utah 2000) (quoting *People v. Cabrera*, 116 Ill.2d 474, 108 Ill.Dec. 397, 508 N.E.2d 708, 714 (1987); *see also United States v. Luciano*, 734 F.2d 68, 70 (1st Cir. 1984) (holding that trial court is granted deference regarding determination of juror's assent to verdict).