2000 ME 103

**STATE of Maine**

v.

**Paul QUIRION.**

Supreme Judicial Court of Maine.

Submitted on Briefs March 29, 2000.

Decided May 26, 2000.

Andrew Ketterer, Attorney General, James M. Cameron, Asst. Attorney General, Leslie G. Clemons, Asst. Attorney General, Augusta, for State.

Ronald W. Bourget, Bourget & Bourget, P.A., Augusta, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Paul Quirion appeals from a judgment entered in the Superior Court (Kennebec County, *Mills, J.*) following his conviction for unlawful trafficking in schedule W drugs (Class B).[1] *See* 17–A M.R.S.A. § 1103(1), (2)(A) (Supp.1999). Quirion contends that the trial court erred (1) by admitting out of court statements made by alleged co-conspirators of Quirion, (2) by failing to adequately cure an improper comment made by the prosecutor during closing arguments, and (3) in its jury instructions. We find no error and affirm the judgment.

[¶ 2] The State's case consisted almost entirely of the testimony of a single witness, agent James Pease of the Maine Drug Enforcement Agency. He testified essentially as follows.

[¶ 3] On February 25, 1997, Pease, working undercover, met with James Holmes at

---

1. Quirion was sentenced to the Department of Corrections for 8 years with all but 3½ years suspended, and 4 years of probation.

Holmes's residence in Damariscotta. Pease asked Holmes if Holmes could sell him any heroin. Holmes responded that "he probably could and that we would have to go to Augusta to get it."

[¶ 4] The two men left the house, entered Pease's car and drove to an Irving gas station and store, where Holmes said he could make collect phone calls. Holmes entered the store and returned five minutes later. He informed Pease that he had made three phone calls but "could not get ... hold of his guy, Paul." He assured Pease that if they could not find Paul, Paul's roommate would "take care of us." He also assured Pease that Holmes's friend Ellsworth (Fred) Runion had purchased some of the heroin the night before for $25 and had said "it was good stuff."

[¶ 5] After leaving the Irving station, the two drove back to Holmes's residence so Holmes could find out how many bags of heroin Fred Runion wished to purchase. Holmes went into his house alone and returned to the car alone. He directed Pease to drive to a Shop 'n Save and told Pease that he needed $1.20 to make a phone call to Augusta. Pease gave him the money and observed Holmes make the call at an outdoor pay phone. Upon returning to the car, Holmes informed Pease that they were "to go to Margarita's on Western Ave. in Augusta to meet with Paul to get the heroin." Holmes asked Pease if it would be okay if Runion joined them, so they returned to Holmes's residence yet again to pick up Runion, and the three then drove to Augusta.

[¶ 6] When they arrived at Margarita's, Holmes and Pease entered the bar, while Runion remained in the car. Pease was introduced to Quirion but did not speak with him at the bar. He did observe a conversation between Holmes and Quirion, although he did not hear what was said between the two.

[¶ 7] Pease was inside Margarita's for only five minutes. When he returned to his car, he was accompanied by Holmes and Quirion. Pease sat in the driver's seat, with Holmes sitting in the front passenger seat and Quirion sitting directly behind Pease. Holmes told Pease that he was to drive Quirion to Quirion's home in Mount Vernon. During the drive, Runion asked Quirion how much the heroin would cost. Quirion replied that it would be $25 per bag. Runion asked Quirion if "he could cut him a deal on the price." When Quirion refused, Runion asked to purchase a single bag of heroin.

[¶ 8] Quirion then asked Holmes how many bags he wanted. Holmes looked at Pease and said, "You want four bags?" Pease answered, "Yes, four bags." Holmes then told Quirion that he wanted four bags of heroin.

[¶ 9] Seconds later, Pease observed Quirion extend his right hand between the two front seats and hand Holmes four plastic bags. At that point, Pease gave Holmes $100. Quirion informed Pease that he needed to stop at a store to get change for Runion. Three to five minutes later, just before pulling into the store, Pease saw Holmes pass the $100 into the back seat, but he "did not see who grabbed it."

[¶ 10] After Pease parked at the store, Quirion exited the car and entered the store. At that point, Holmes handed the four plastic bags to Pease, and Pease placed them in his pocket. When Quirion returned to the car, Pease heard him say to Runion, "Here's your change." Pease then drove to Quirion's residence and Quirion exited the car.

[¶ 11] On the drive back to Damariscotta, Pease observed Runion as he put a plastic bag, similar to the four Pease had received, up to his nose and inhaled its contents. Runion then commented, " 'This is really good shit, this is really good stuff.' "

[¶ 12] After dropping Holmes and Runion at Holmes's residence, Pease met with his supervisor and gave him the plastic bags. The contents were later identified as heroin.

[¶ 13] Quirion was indicted on one count of unlawful trafficking in a schedule W drug. At trial, the court, over the objection of Quirion, granted the State's motion in limine seeking the admissibility of the testimony of Pease concerning the statements made by Holmes and Runion that incriminated Quirion. The State contended that Holmes and Runion were co-conspirators in the transaction and that their statements were admissible pursuant to M.R. Evid. 801(d)(2)(E).

[¶ 14] During the State's rebuttal closing argument, the prosecutor commented on the fact that the defendant did not offer any suggestions as to who might have sold the drugs to Pease if it was not the defendant. Quirion objected to these comments and the court sustained the objection. At the close of the State's rebuttal argument, Quirion requested a curative instruction, and the court gave such an instruction to the jury before sending the jury out to deliberate.

[¶ 15] During the jury's deliberations, the court received a note asking for a readback of a portion of Pease's testimony. The court, over objection from Quirion, directed the court reporter to read back the requested testimony. Sometime later, the jury sent another note to the court, this time asking the court if they must find that Pease actually saw Quirion take possession of money in order to convict him. Over Quirion's objection, the court reinstructed the jury regarding the difference between circumstantial and direct evidence.

[¶ 16] After the jury returned to its deliberations, Quirion objected to the content of the additional instructions and asked for a mistrial. He argued that because the court did not reiterate that even circumstantial evidence must be proven beyond a reasonable doubt, the jury could have mistakenly believed that it could find the defendant guilty if it found that guilt was a "reasonable inference" to be drawn from the direct evidence. Before the court could reinstruct the jury regarding reason-

able doubt, however, the jury reached a verdict. The court informed Quirion that it was satisfied with the instructions the jury had received, and it allowed the jury to announce its verdict without any further instructions. The jury found Quirion guilty. This appeal by Quirion followed.

## I.

[¶ 17] Quirion argues that the State failed to meet its burden of establishing that the statements made by Holmes and Runion were made in the course of and in furtherance of a conspiracy that involved Quirion, and therefore, the statements were inadmissible hearsay.

[¶ 18] M.R. Evid. 801(d)(2)(E) provides that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. We have held that, in order for an out of court statement of a co-conspirator to be admissible, the trial court must find, by a preponderance of the evidence, that "(1) the statement was made during the course of a conspiracy; (2) the statement was made in furtherance of the conspiracy;" and (3) the defendant participated in the conspiracy. *See State v. Quimby*, 589 A.2d 28, 30 (Me. 1991). In making those findings, "[t]he contents of the statement shall be considered, but are not alone sufficient to establish ... the existence of the conspiracy and the participation therein of the declarant" and the defendant. *See* M.R. Evid. 801(d)(2); *see also* M.R. Evid. 801(d)(2) advisory committee's note to 1998 amend., Me. Rptr., 699–709 A.2d CXX ("Under the rule as amended, the hearsay statements could be used to prove the foundation for the vicarious admission, but would not alone be sufficient proof of such foundation without some independent evidence.").

[¶ 19] The trial court's decision to admit statements made by alleged co-conspirators "will be vacated only if the historical facts on which its decision is based are clearly erroneous or if it abused its

discretion." *See State v. Quimby,* 589 A.2d at 29.

### A.

[¶ 20] The evidence adequately supports the court's finding that a conspiracy existed in this case and included Quirion, Holmes, and Runion. A conspiracy is committed when two or more persons agree to commit a crime and one of the coconspirators takes a substantial step toward the commission of that crime. *See* 17–A M.R.S.A. § 151(1)–(4) (1983). Here, there was independent evidence of a conspiracy to buy and sell illegal drugs. Pease met with Holmes at Holmes's residence and told him that he was looking to buy some heroin. Pease observed Holmes make several calls and was present when Runion entered the car. The three drove to Augusta where they met Quirion, who then joined them in the car. Quirion made statements that he was charging $25 per bag of heroin and that the price was not negotiable. Quirion also asked both Holmes and Runion how many bags they wished to purchase. Pease then observed Quirion pass bags of heroin to Holmes. Pease gave Holmes $100, and Holmes handed the money to a person in the back seat of the car where Quirion was seated.

[¶ 21] This evidence, standing alone, supports the court's finding that there was a conspiracy to buy and sell drugs that involved Quirion, Holmes, and Runion. The statements of Holmes and Runion testified to by Pease served only to confirm the existence of the conspiracy and give added detail as to its scope.[2]

### B.

[¶ 22] The trial court also had before it sufficient evidence that the statements were made during the course of the conspiracy. A conspiracy is born when a person, "with the intent that conduct be performed which, in fact, would constitute a crime or crimes ... agrees with one or more others to engage in or cause the performance of such conduct." *See* 17–A M.R.S.A. § 151(1) (1983). Pursuant to that definition, the conspiracy in this case began when Holmes agreed to help Pease purchase drugs.[3] Accordingly, any statements made after that initial meeting were made during the conspiracy.

[¶ 23] Quirion contends, however, that only statements made after he became a member of the conspiracy can be admitted against him. We have not addressed whether statements in furtherance of a conspiracy made before a defendant joins the conspiracy may be used against a defendant who joins the conspiracy after the statements are made. The First Circuit, while recognizing that *substantive liability* for crimes committed during a conspiracy only attaches for crimes committed *after* a party joins the conspiracy, has held

2. This case is similar to *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), in which the Court made the following analysis:
   Petitioner's case presents a paradigm. The out-of-court statements of Lonardo indicated that Lonardo was involved in a conspiracy with a "friend." The statements indicated that the friend had agreed with Lonardo to buy a kilogram of cocaine and to distribute it. The statements also revealed that the friend would be at the hotel parking lot, in his car, and would accept the cocaine from Greathouse's car after Greathouse gave Lonardo the keys. Each one of Lonardo's statements may itself be unreliable, but taken as a whole, the entire conversation between Lonardo and Greathouse was corroborated by independent evidence. The friend, who turned out to be petitioner, showed up at the prearranged spot at the prearranged time. He picked up the cocaine, and a significant sum of money was found in his car. On these facts, the trial court concluded, in our view correctly, that the Government had established the existence of a conspiracy and petitioner's participation in it.
   *Id.* at 180–81, 107 S.Ct. 2775.

3. Even though Pease was a police officer and did not intend to do anything illegal, the statute only requires that one party have the requisite intent. *See* 17–A M.R.S.A. § 151(1) (1983).

that the nearly identical co-conspirator provision of the Federal Rules of Evidence allows statements made by conspirators *prior* to a party joining the conspiracy to be used against that party at trial. *See United States v. Goldberg*, 105 F.3d 770, 775–76 (1st Cir.1997) (construing Fed. R.Evid. 801(d)(2)(E) and noting that this approach is "followed in most circuits"). We adopt the same construction of M.R. Evid. 801(d)(2)(E).[4]

## II.

[¶ 24] In his rebuttal argument, the prosecutor made the following comments:

I was waiting through the trial, in light of the cross-examination, and waiting throughout the closing by the defense attorney, to hear who the defense is suggesting was the one who actually did sell the heroin.

Quirion objected that the prosecutor's comment improperly suggested that the defendant bore some burden of proof in the case, and he requested a curative instruction. The court sustained the objection and instructed the jury that the State had the burden of proof, and that the defendant had no burden and need not present any evidence. Quirion contends that the curative instruction was inadequate and that a mistrial should have been declared.

[¶ 25] When a defendant objects to statements made by a prosecutor during closing argument and the court issues a curative instruction, the defendant must make a further objection or move for a mistrial to preserve the issue for appeal. *See State v. Jones*, 580 A.2d 161, 163 (Me. 1990). Because Quirion did neither, he has failed to preserve this issue for appeal,

and we review the curative instruction given by the court for obvious error. *See State v. Marques*, 2000 ME 43, ¶ 17 n. 5, 747 A.2d 186, 191 n. 5. In this case, the curative instruction was adequate to remedy the error made by the prosecutor. *See State v. Naoum*, 548 A.2d 120, 123 (Me. 1988) (recognizing the presumption that a jury will follow a curative instruction).

[¶ 26] Quirion also contends that in instructing the jury on the difference between direct and circumstantial evidence, the court erred by failing to make clear that the facts found from circumstantial evidence, as well as direct evidence, have to be found beyond a reasonable doubt. Quirion's objection to the instructions, however, was not made until the jury had been instructed, then reinstructed, and was deliberating. Indeed, the jury indicated that a verdict was reached before the court was able to act on Quirion's objection. Accordingly, the objection was not timely. *See* M.R.Crim. P. 30(b) (stating that objections to jury instructions must be made "before the jury retires to consider its verdict"). We review such an objection for obvious error. *See* M.R.Crim. P. 52(b). Even though Quirion's challenge is to the instructions given during reinstruction, we view the charge to the jury in its entirety. *See State v. Huntley*, 681 A.2d 10, 14 (Me.1996). In doing so, we discern no obvious error. *See State v. Davis*, 528 A.2d 1267, 1269 (Me.1987) (discussing the obvious error standard).

The entry is:

Judgment affirmed.

---

4. Finally, though most of the statements admitted at trial were clearly made in furtherance of the conspiracy, a few of them could be characterized as merely "'idle chatter'" that, while prejudicial, were not in furtherance of the conspiracy. *See United States v. Cornett*, 195 F.3d 776, 782 (5th Cir.1999) (quoting *United States v. Means*, 695 F.2d 811, 818 (5th Cir.1983) and holding that "while the in furtherance requirement is not a strict one, it is a necessary one"). Quirion, however, has not raised this issue. Our review is for "obvious errors affecting substantial rights," *see* M.R. Evid. 103(e), and we conclude that admission of any statements that were not in furtherance of the conspiracy does not rise to the level of obvious error.