STATE OF MAINE

AROOSTOOK, ss

UNIFIED CRIMINAL COURT
LOCATION: HOULTON
DOCKET NO. CR-19-30895

STATE OF MAINE          )
                        )
                        )
                        )
vs.                     )          ORDER ON MOTION
                        )            TO SUPPRESS
                        )
                        )
PEDRO ROSARIO,          )
          Defendant     )

By an indictment dated March 12, 2020, the Defendant, Pedro Rosario (hereafter

"Rosario") is charged with Aggravated Trafficking in Scheduled Drugs, Class A (17-A M.R.S.A.

§1105-A(1)(M)). Before the court is the Rosario's Motion to Suppress, filed October 30, 2020.

Hearing on the motion was held January 11, 2021. At hearing testimony was received from

MDEA Agents William Campbell, Forrest Dudley and John Gaddis, and Maine State Police

Officers Hunter Cotton and Chad Fuller. Also admitted into evidence were the following exhibits

(Ex.__):

   Ex. 1- recording of interview of Rosario (first 8");

   Ex. 2- signed Miranda warning;

   Ex. 3-transcript of recording of interview of Rosario, with Spanish to English translation[1];

   Ex. 5- email from T-Mobile with GPS data at 11:26 am PST;

---

[1] The parties stipulate that the translation of Spanish to English, done by Darlene Metcalf-
Bergeron, is done accurately and by someone duly qualified to conduct such translation.

1

Ex. 6- email from T-Mobile with GPS data at 11:32 am PST;

Ex. 7- email from T-Mobile with GPS data at 11:33 am, 11:35 am, 11:37 am, 11:42 am, 11:47 am, 11:52, and 11:57 am, PST ;

Ex. 9- video recording of felony traffic stop (first 6"); and

Ex. 10- photograph.

Rosario contends that on December 18, 2019 the vehicle he was a passenger in was illegally stopped without articulable suspicion, that he was illegally arrested without probable cause, and that he was illegally interrogated. The State contends that at the time the vehicle Rosario was occupying was stopped, following which Rosario was immediately placed under arrest, probable cause existed that Rosario participated in a criminal conspiracy pursuant to 17-A, M.R.S.A. §151.

Findings of Fact.

In September, 2019, a confidential informant (hereafter "CI") that had been working with MDEA told Agent Campbell that Arhenny Messon, who the CI had served time with in prison, had contacted the CI inquiring if he wanted to conduct some drug deals. The CI was someone Agent Campbell had worked with previoulsy and found reliable, so he instructed the CI to reach back to Messon. The CI and Messon had multiple phone calls, all recorded by MDEA, in which sales and prices of Cocaine and Methampthetamine were discussed. During a phone call on September 11, 2019, Messon told the CI his brother would be contacting him to further discuss. Messon did not tell the CI his brother's name, but did provide him the phone number his brother would be using.

2

A few minutes later the CI received a phone call from the number he had been provided from a man who identified himself as Messon's brother. The CI and Messon's brother discussed making a drug transaction. At the end of the conversation, Messon's brother identified himself as "Peter".

Over the next several weeks the CI and "Peter" had additional phone calls discussing a sale of Cocaine and Methampthetamine. All of the calls were monitored and recorded by Agent Campbell. During this time, Agent Campbell did some background investigation of Messon, and learned he had a brother named Pedro Rosario who lived in Rhode Island. Campbell then did some background investigation of Pedro Rosario. Agent Campbell developed a "hunch" that Pedro Rosario was "Peter". Now having biographical data on Rosario, Agent Gaddis, who was on loan from Homeland Security, obtained a mug shot of Rosario and provided it to Campbell for use in the investigation[.]

In early December, 2019, the CI and "Peter" agreed to meet in New Hampshire to conduct a sale for 4 oz. of Metamphetamine. This transaction was canceled, but the CI and "Peter" continued having phone calls and agreed to meet in Presque Isle for a sale of 4 oz. of Methamphetamine for $9,000. Agent Campbell instructed the CI to move the location to Houlton, but this transaction was cancelled because "Peter" could not find a driver. A few days later "Peter" called the CI and told him he had found a driver, and they agreed on a meeting date of December 18, 2019 in Houlton. "Peter" also asked the CI how long it would take him to "..get

---

[.] During the hearing, the defense objected to the introduction of the photograph asserting the State had not complied with a discovery request to produce all records. The photograph was produced in the discovery. The court's understanding is Agent Gaddis telephoned a dispatcher at Homeland Security requesting a copy of any photographs of Rosario. On this record the court does not find that the State failed to produce any records related to the photograph and the objection is overruled.

3

rid of a whole one?" The CI asked "Peter" what he meant, and "Peter" responded 32 oz., which was understood to be Methamphetamine. The gist of the plan was "Peter" would sell the CI 32 oz. of Methamphetamine, with $10,000 to be paid at the time of the exchange on December 18, 2019 and the balance paid when the drugs were sold. The meeting place in Houlton was to be near the Houlton Big Stop.

On December 17, 2019 Agent Campbell applied for and obtained a search warrant for GPS tracking data of the cell phone number "Peter" had been using to communicate with the CI. Agent Dudley had been assigned the role of receiving the GPS location data being sent from T-Mobile and monitoring the location of the phone "Peter" was purportedly using. Location data was initially received every 15 minutes, but shorter intervals were requested as they got closer to the destination time. At each time interval, T-Mobile issued an email with the latitude/longitude data for the location of the phone, unless the phone was disabled, off, or there was no cell phone reception to record a location, in which event the email from T-Mobile contained the message "Absent Subsriber" (See Ex. 5, 6 and 7). The location data was accuarate to within 25 meters.

On the morning of December 18, 2019 a pre-operation meeting was attended by the MDEA agents and MSP officers involved in the investigation. At the meeting the anticipated transaction with "Peter" was reviewed, details of the investigation to date were shared, roles were assigned, and a photograph of their suspect, Rosario, was circulated. Agent Gaddis and Trooper Cotton, whose roles will be discussed more, infra, were shown the photograph of Rosario.

At approximately 9 am on December 18, 2019, "Peter" contacted the CI and told him he was on his way north and was in a gray Toyota. Agent Campbell assumed the Toyota was a sedan, and suspected it had out of state plates, pesumably Rhode Island. Agent Campbell

4

anticipated "Peter" would arrive in Houlton at approximately 2 pm. Over the next few hours, Agent Dudley intermittently received emails with location data of the phone, showing the phone traveling north on I-95, which he relayed to the other agents and officers. An email received by Agent Dudley at 1:47 pm indicated the phone was in Houlton near the meeting location. (Stipulation by parties). But then "Peter" called the CI and told him he saw a white vehicle at a nearby gas station which he thought was a police vehicle, and was calling off the transaction. After that the location data emails being received by Agent Dudley showed the phone traveling south on I-95. At that development Agent Dudley instructed T-Mobile to shorten the time intervals between email notifications. Agent Dudley monitored the location data over the next 30 minutes as the phone traveled south on I-95, and relayed this information to the officers on the road.

At that time, MSP Officers Fuller and Cotton were both in position on I-95. Trooper Cotton had parked on the I-95 cross-over at mile 272, watching south bound traffic for out-of state vehicles. Sergeant Fuller was assigned to conduct a traffic stop on I-95 of the vehicle in which the phone was located. At 2:26 pm Agent Dudley received, and forwarded to the other officers, location data which showed the phone's location being near the Island Falls I-95 exit, near mile 276. (See Ex. 5). Sergeant Fuller recognized the location to be just south of his position on the highway, so he accelerated to catch the vehicle he suspected contained the phone. Within moments he caught up to an SUV style KIA, with Massachussetts plates, with another vehicle just ahead of the KIA. When he caught up to the KIA he initiated a felony stop. Sergeant Fuller based his felony stop of the KIA due to it being located where the GPS location data indicated the phone was located, and the KIA having out-of-state plates, consistent with their knowledge

5

that the suspect was traveling to Houlton from Rhode Island. Fuller did not make any observations about the occupants of the KIA before initiating the stop.

Meanwhile, Trooper Cotton who was at the mile 272 cross-over saw two southbound vehicles approach and go past him. Those vehicles were immediately followed by Sergeant Fuller's vehicle. At the pre-operation meeting, Trooper Cotton had been shown a photograph of Rosario. At the hearing Trooper Cotton testified he saw two dark complexioned occupants in the SUV that had Massachussetts plates. Trooper Cotton got on the highway and proceeded south behind Sergeant Fuller to assist in the stop. In the video of the stop, Trooper Cotton is heard telling the other officers via his radio "..602 is behind the car....I ID'd the two occupants in it..it's a Dodge Avenger I think, gray.." (See Ex. 9). Neither Sergeant Fuller nor Trooper Cotton observed the subject SUV speeding or make any other moving violations which would independently warrant a stop. Per Trooper Cotton, the stop was initiated at 2:32 pm. The volume of traffic on I-95 at the time and location of the stop was very light. (See Ex. 9).

Upon Sergeant Fuller activating his blue lights to initiate the felony stop of the KIA, the KIA pulled over and stopped in the breakdown lane. The vehicle immediately ahead of the KIA continued south on I-95.(See Ex. 9). Sergeant Fuller yelled intructions to the operator of the KIA to exit the vehicle. The operator complied, and the operator was immediately placed in handcuffs. Instructions were then yelled to the passenger in the KIA to exit the vehicle. The passenger door was opened, but the passenger appeared confused and began speaking in Spanish. (See again Ex. 9). By then, Agent Gaddis, who had been riding with Trooper Record and spoke Spanish, arrived on scene. Speaking in Spanish, Agent Gaddis ordered the passenger to exit the vehicle. The passenger complied, and he also was immediately placed in handcuffs. Agent

6

Gaddis recognized the passenger as Pedro Rosario, the suspect they had been shown a photograph of earlier that day at the pre-operation meeting.

The State concedess that the driver of the KIA and Rosario were under arrrest at the moment they were placed in handcuffs. After the two men were handcuffed and under arrest, the vehicle was sniffed by the trained canine handled by Trooper Record and no evidence contributing to probable cause was detected. (Oral stipulation entered by the parties). The parties also agree no contraband was seized pursuant to a search of the KIA. The record on this motion is silent as to whether phones of any kind were found in the vehicle.

After clearing the scene where the KIA was stopped, Rosario was taken to MDEA headquarters in Houlton to be questioned. The interrogation was done by Agent Campbell, who was in plain clothes. Agent McDonough, who was in a Border Patrol Uniform, was also present. McDonough was carrying his service issued firearm. The interrogation was held in an MDEA conference room, with the door shut. Rosario arrived still in handcuffs. The interview began at 3:38 pm, just over an hour after Rosario's arrest.

Upon commencing the interrogation, Agent Campbell read to Rosario the Miranda warnings in English. Agent McDonough then translated each of the warnings into Spanish. (See Ex. 1 and 3 for exact wording and translation). Rosario indicated he understood the warnings as translated by Agent McDonough, by responding either "Yes" or "OK". Rosario was then instructed to initial and sign the Miranda Warning form. (Ex. 2).

Agent Campbell conducted his questioning of Rosario in English. Rosario responded mostly in English, but there were a few occasions at which Agent McDonough did provide translation. Partway through the interview, Agent McDonough was replaced by Agent Astle, whose native language was Spanish. According to Agent Campbell, Rosario never stated he

7

didn't understand the questions, and on at least two occasions Agent Campbell asked Rosario to confirm he understood. Prior to Rosario's arrest, all of the communications between "Peter" and the CI that Agent Campbell listened to were spoken in English. Although not made clear on the evidentiary record, for the purpose of this motion the court assumes Rosario's native language is Spanish.

Sometime during the interview of Rosario, after Miranda rights had been provided, Agent Campbell learned that fellow agents had found drugs in a gray Toyota matching the description of the vehicle "Peter" told the CI he would be in. The operator of the gray Toyota was a person named Kelvin Mosques.

## 2. Discussion

Rosario is charged with aggravated trafficking in scheduled drugs, 17-A M.R.S.A. §1105-A(1)(M). But the State also argues that the probable cause justifying the arrest of Rosario is based on conspiracy to commit a crime pursuant to 17-A, M.R.S.A. §151. Generally, a conspiracy is committed when two or more persons agree to commit a crime and one of the co-conspirators takes a substantial step toward the commission of that crime. *State v. Quirion*, 2000 ME 103, ¶20. A conspiracy is born when a person, "with the intent that conduct be performed which, in fact, would constitute a crime or crimes...agrees with one or more others to engage in or cause the performance of such conduct." *Id.*, ¶22; 17-A M.R.S.A. ¶151(1). And the statute only requires that one party to a conspiracy have the requisite intent. *Id.*, fn.3. The classification of a conspiracy charge is one classification lower than the most serious crime that is the object of the conspiracy. 17-A M.R.S.A. §151(1).

8

A. Did law enforcement have a reasonable articulable suspicion to stop the vehicle Rosario was occupying?

Whether or not there was an articulable suspicion to stop the vehicle may be moot, as the State is not arguing this was an investigatory stop, but rather concedes the stop was made to initiate an arrest. And if there was in fact probable cause to arrest, that would subsume a finding of a reasonable articulable suspicion. *State v. Lagasse*, 2016 ME 158, ¶ 21. The court will however proceed sequentially and address this issue as raised by Rosario.

To conduct a constitutionally permissible traffic stop, an officer must have, at the time of the stop, an articulable suspicion that criminal conduct has taken place, is occurring, or imminently will occur, and the officer's assessment of the existence of specific and articulable facts sufficient to warrant the stop must be objectively reasonable in the totality of the circumstances. *State v. Donatelli*, 2010 ME 43, ¶ 11; *State v. Lux*, 1999 ME 136, ¶ 8. The suspicion for the stop must be based on information available at the time of the stop and cannot be bolstered by evidence secured by the stop. *State v. Nelson*, 638 A.2d 720, 722 (Me. 1994). The reasonable suspicion standard requires more than mere speculation. *Id.*

At the time of the stop, through the process of setting up and investigating an organized buy of drugs, the officers reasonably believed an individual who called himself "Peter" and referred to himself as Arhenny Messon's brother, had agreed to travel to Houlton, Maine to sell to the CI 32 oz. of Methamphetamine. The investigating officers also understood "Peter" was from from out-of-state, Rhode Island, and that the vehicle he was in would have out-of-state plates, and that "Peter" would be traveling with his driver. By way of cellular phone GPS tracking, the agents reasonably believed that "Peter", or whoever was on the other end of the phone communications with the CI, had traveled to Houlton to complete the sale, but upon arriving near the location for the proposed sale, "Peter" called off the transaction due to fear of

9

his seeing a police vehicle. And by the same GPS tracking, the agents reasonably believed "Peter" was then headed south on I-95. The GPS tracking location data was accurate to within 25 meters, and the location data was being shared with the police officers on the road. The officers on the road, Officers Fuller and Cotton, recognized the location data for the suspect being in the immediate area where they were positioned, and matched the location of the vehicle(s) they observed having out-of-state license plates. The video shows that there were two vehicles travelling closely together in this location. At the moment the officers saw a vehicle with out-of-state plates being in the location where the GPS location data indicated the suspect's phone was located, the officers reasonably believed, and had an articulable suspicion, that the vehicle contained the individual who had agreed with the CI to travel to Houlton to sell him drugs. And at that moment, based on those same facts, the officers had an articulable suspicion that the drugs would be with the suspect in the vehicle. Accordingly, when the officers stopped the vehicle they had an articulable suspicion that criminal conduct had taken place, or was occuring, whether it be drug trafficking, drug possession, or a conspiracy to commit such crime.

B. Did law enforcement have probable cause to arrest Rosario?

Law enforcement officers are authorized to make a warrantless arrest under certain circumstances, including when an officer has probable cause to believe that a person has committed a Class A, Class B, or Class C crime. 17-A M.R.S.A. §15(1)(A)(2); *State v. Lagasse*, 2016 ME 158, ¶13. Probable cause exists where facts and circumstances within the knowledge of the officers and of which they have reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee did commit or is committing the felonious

offense. *Id.* Probable cause includes the collective information known to the police and is not limited to the personal knowledge of the arresting officer, and the test is an objective standard. *Lagasse,* at ¶14. The probable cause standard is flexible and based on common sense. *State v. Flint,* 2011 ME 20, ¶12; see *Texas v. Brown,* 460 U.S. 730, 742, 103 S. Ct. 1535 (1983). Although requiring more than mere suspicion, probable cause can be satisfied on less than the quantum of proof necessary to establish a fact by a fair preponderance of the evidence. *Id.,* see also *State v. Lux,* 1999 ME 136, ¶10.

The same facts supporting an articulable suspicion support probable cause. This investigation started when the CI, who had previously proven to be reliable, brought to MDEA information that Arhenny Messon had contacted him about doing some drug deals. Messon then connected the CI with a person he said was his brother, who called himself "Peter". Both Messon and "Peter" were from out-of-state. "Peter" and the CI had several communications, all which were recorded and listened to by MDEA. After several phone calls "Peter" and the CI agreed "Peter" would travel to Houlton on December 18, 2019, and they would meet near the Houlton Big Stop, where "Peter" would sell the CI 32 oz. of Methamphetamine in exchange for $10,000 to be paid then and the balance paid when the drugs were sold.

Via a warrant, MDEA was able to monitor the location of the phone "Peter" was using via cellular GPS tracking. On December 18, 2019, Agent Dudley tracked the phone "Peter" was using travel north along I-95 to Houlton to a location very close to the agreed meeting place. When near the meeting place, the individual who called himself "Peter" telephoned the CI, using the same phone number used throughout the transaction and being tracked, and told the CI he saw a vehicle he thought was a police vehicle and was calling off the deal. Agent Dudley then received tracking data showing the same phone headed south on I-95, back in the direction it had

come from. The tracking evidence of the phone establising it traveled north to Houlton to the agreed meeting spot corroborates "Peter's" statements to the CI that he would come to Houlton to sell him drugs.The monitored phone calls and tracking information of the phone would warrant a prudent and cautious person to believe the person on the other end of the phone being monitored and tracked had agreed to travel to Houlton to complete a sale of Methamphetamine, a drug trafficking offense.

Agent Dudley continued to monitor and track the phone as it headed south on I-95. The investigating agents and officers understood "Peter" was from out-of-state, and that the vehicle "Peter" was in would have out-of-state plates, likely Rhode Island or Massachussetts, and he would be traveling with his driver. Agent Dudley received, and forwarded to the MSP officers on the highway, the GPS location data for the suspect phone. Officers Cotton and Fuller received the location data, accurate to within 25 meters, showing the phone in the immediate location they were each positioned. Sergeant Fuller accelerated south on I-95 and immediately found a vehicle with out-of-state plates. Similarly, Officer Cotton, who was stationary at mile 272, a location very close to the last location data he just received for the phone, observed a vehicle with out-of-state plates go past him with two occupants. Per the video of the stop, traffic on the highway was sparse, making identification of the suspect vehicle by way of location more probable. (See Ex.9) These facts would warrant a reasonable and cautious person to believe that the phone being tracked and monitored was in the vehicle Officers Cotton and Fuller observed and stopped near mile 272.

Thus far the State has established facts exist which would warrant a prudent and cautious person to believe that the vehicle stopped contained the phone being tracked and monitored, and that the person at the other end of the phone had agreed to a sale of Methamphetamine, a

12

conspiracy to commit a crime. So probable cause would exist to arrest the individual who was associated with the phone.

The person arrested was Rosario, but at the time of the arrest, the actual phone had not been found or seized. The State concedes that the two individuals in the stopped KIA were effectively under arrest when placed in handcuffs at the scene. Rosario asserts that probable cause had not yet been established linking him to the activities. The court disagrees.

By investigating various background records, MDEA Agent Campbell had developed a "hunch" that the person who was Arhenny Messon's brother and referred to himself as "Peter" was Pedro Rosario. By the time of the December 18, 2019 organized buy, Agent Campbell had obtained with Agent Gaddis' assistance a photograph of Pedro Rosario. The photograph of Pedro Rosario was circulated amongst the officers during the pre-operation meeting, and they were told Pedro Rosario was their suspect.

Just seconds before Officer Fuller effected the stop of the KIA, Trooper Cotton is heard on his radio telling other officers that "602", presumably referring to Officer Fuller, was behind the car and that he had ID'd the two occupants in it. Agent Gaddis, who was the agent who procured the photograph of Pedro Rosario, arrived on the scene just as the driver of the KIA had been ordered to exit the vehicle. When the passenger of the KIA appeared confused by the instructions given to him in English, Agent Gaddis gave him instructions in Spanish. Agent Gaddis recognized the passenger to be Pedro Rosario, the person shown in the photograph circulated at the pre-operation meeting. Following the instructions given by Agent Gaddis in Spanish, Rosario exited the KIA and was placed in handcuffs. As previously discussed, probable

cause includes the collective information known to the police, not just the arresting officer, and is an objective standard. *State v. Lagasse*, 2016 ME 158, ¶14.

Initially, Agent Campbell had only a hunch that "Peter" was Pedro Rosario. But when Rosario was in fact arrested, it was no longer just a hunch. Again, the quantum of proof necessary to establish probable cause, although more than mere suspicion, is less than the level of fair preponderance of the evidence. *Lux*, ¶10. Rosario was arrested after he was found in the car that the police had stopped on the basis that it likely contained the phone possessed by a person named "Peter" who had agreed to sell Methamphetamine, the phone which they had been tracking and monitoring throughout the day. Rosario matched the additional evidence that MDEA had collected through its investigation- that the suspect "Peter" was from out of state, and was Arhenny's brother. And Rosario was found where MDEA expected to find "Peter". In addition, Rosario was found with another individual, the driver of the vehicle, consistent with "Peter's" phone conversations of having a driver. Finding Rosario where they did, with another individual driving the vehicle, corroborated their beliefs that he was "Peter". By the time the arrest was effected, facts existed which would warrant a prudent and cautious person to believe Rosario was "Peter", who had agreed to the conspiracy to sell drugs. Accordingly, the court finds probable cause existed to arrest Rosario.

C. Were Rosario's Fifth Amendment rights violated?

A defendant's statement made during a custodial interrogation may only be used against him if the statement was made voluntarily after a knowing and intelligent waiver of his Fifth Amendment right against self incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct.

1602 (1966). The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Id.* Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. *Id.*

*Miranda* itself indicates no talismanic incantation is required. *California v. Prysock*, 453 U.S. 355,359, 101 S.Ct. 2806 (1981). But the safeguards do include the now familiar *Miranda* warnings- that the defendant be informed he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning. *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S. Ct. 1682 (1980), citing *Miranda*, p. 479.

A defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986). First, the relinquishment must be voluntary, in the sense it was the product of a free and deliberate choice, and not intimidation, coercion or deception. Second, the waiver must be made with a full awareness of the nature of the right being abandoned and consequences of the decision[.] *Id.* Only if the totality of the circumstances surrounding the interrogation, including the accused's characteristics, the conditions of the interrogation, and the conduct of the of law enforcement officials, reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

---

[.] A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver. *United States v. Hernandez*, 913 F.2d 1506, 1509 (Tenth Cir. 1990).

*Avincola v. Stinson*, 60 F. Supp. 2d 133, 158 (1999); citing *Moran v. Burbine*, 475 U.S. at 421.

The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of *Miranda* warnings by a preponderance of the evidence. *State v. Coombs*, 1998 ME 1, ¶ 15.

As for translated *Miranda* rights, language barriers may inhibit a suspect's ability to knowingly and intelligently waive his rights, but when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated. *United States v. Hernandez*, 913 F.2d 1506, 1510 (Tenth Cir. 1990). The translation of *Miranda* rights need not be perfect so long as the defendant understands those rights. *Id.*, citing *United States v. Yunis*, 859 F.2d 953, 959 (D.C.Cir.1988).

In this case Agent Campbell interrogated Rosario in the conference room at MDEA offices, with the door closed. Agent Campbell was in plain clothes, and was not carrying a firearm. Agent McDonough was in a uniform, and had his service firearm. The interrogation began at approximately 3:40 pm, just over an hour after the arrest. There is no evidence suggesting Rosario was injured, ill, tired, or under duress. And there is no evidence suggesting Rosario's decision to speak with the agent was a result of intimidation, coercion or deception. Rather, the issue being raised by Rosario is that, due to Agent McDonough's translation, he was not fully aware of the rights being abandoned and consequences of the decision, and therefore the waiver was not made knowingly and intelligently. The court disagrees.

At the commencement of the interview, Agent Campbell read in English each of the Miranda warnings as set forth on their Miranda Warning Form. (Ex. 2). After Agent Campbell read each of the rights in English, Agent McDonough translated the right and stated it to Rosario in Spanish. The parties stipulate that the translation of the transcription of the interview is an accurate translation of what Agent McDonough stated to Rosario in Spanish. (Ex. 3). The rights

as stated by McDonough in Spanish, translated back into English, and Rosario's responses, are

as follows:

> McDonough: Ah it need he um tell you your rights.
> Rosario: OK
>
> McDonough: He to be an official of the law. Um he has questions for you. He need to
> read you your rights. Do you understand?
> Rosario: Yes
>
> McDonough: You have the right to remain silent. Do you understand that?
> Rosario: Yes
>
> McDonough: Anythings you ah say can and to be used against you a court of law. Do you
> understand that?
> Rosario: Aha (OK)
>
> McDonough: You have um the right to speak with a lawyer and that this is present with
> you when um you are interrogated. Do you understand?
> Rosario: Aha (OK, Yes)
>
> McDonough: OK, if you don't have the economic availability to contract/hire a lawyer,
> one will be assigned to represent you before any interrogated. Do you understand?
> Rosario: Aha (OK)

Agent Campbell also read an additional warning from their Miranda Warning form (Ex.

2). From the transcript of the interview, it is clear Agent McDonough initially had difficulty

forming a translation for this warning. After some failed attempts, Agent McDonough fully

restated a translation as follows:

> McDonough: You have the right to pronounce silence, right to request a lawyer and can
> proceed to answer any question, make any comment if you wish. If you decide to answer
> the questions, you can stop at the moment you were saying and demand your right to
> request a lawyer. This is.. Do you understand?
> Rosario: Yes

It is apparent that Agent McDonough had some difficulty forming translations for each of the rights, but the court does not find that the translations were fatally flawed. The right to remain silent was perfectly stated, and Rosario stated he understood. The warning that anything he stated could be used against him in court was also sufficient. Granted, McDonough's translation of "Anythings you ..say can and *to be* used against you a court of law." was not proper grammar, as *to be* is the unconjugated form of the verb that is conjugated to state *will be*. So although not grammatically correct, the warning given was not substantively wrong. Rosario was warned anything he said could be used against him in court, and he acknowledged understanding.

The third and fourth warnings given by Agent McDonough were "You have um the right to speak with a lawyer and that this is present with you when um you are interrogated" and "if you don't have the economic availability to contract/hire a lawyer, one will be assigned to represent you before any interrogated". Again, Agent McDonough's translation lacked in perfect grammar and diction, such as use of the word availability versus ability. But the third and fourth warnings together advised Rosario he had the right to speak with a lawyer, and if he didn't have the economic means to hire a lawyer, one would be assigned before he was interrogated. And considering the third and fourth warnings collectively, Rosario was advised his right to a lawyer began before he was interrogated, and was present with him during the interrogation. And Rosario responded that he understood each of the warnings given, by his responses of "Aha", interpreted as "OK". Again, the translation of *Miranda* rights need not be perfect. *Hernandez*, 913 F.2d at 1510.

The facts of this case are distinguishable from those of the case relied upon by Rosario, *United States v. Botello-Rosales*, 728 F.3d 865 (Ninth Cir. 2103). In *Botello-Rosales*, testimony

from lay and expert witnesses supported the court's finding that the translation using the term "libre" resulted in an incorrect translation, it meaning "free as in being available or at liberty to do something.." *Botello-Rosales*, 728 F.3d at 867. This case does not present with translated words having a totally different meaning than what *Miranda* requires. In *Botello-Rosales* a translation was given that was wrong and misleading. A defendant receiving a wrong or misleading translation would be none the wiser, and in such a case a waiver would be unreliable. This case is different as the translation was not wrong, but rather was grammatically sloppy. Certainly a sloppy translation could be hard to understand. But if a defendant indicates he understands the rights that have been explained to him, even if stated in improper grammar, and there is otherwise no evidence of not understanding the rights explained, the reliability of the waiver would not be in question. There is no indication on this record that Rosario did not understand the rights explained to him.

Also relevant in this case is that Rosario demonstrated he understood English. All of his conversations with the CI negotiating the drug sale were in English. Apparently the first time Rosario demonstrated an inability to understand English is when the Officer Fuller yelled instructions to Rosario to exit the vehicle. Otherwise, Agent Campbell testified that after the *Miranda* warnings were given, Rosario responded to all of his questions in English. To be sure Rosario undertood, on at least two occasions, Agent Campbell asked Rosario to confirm he understood, and he responded he did. The court has been provided only the initial eight minutes of the interview. But in that brief excerpt, Rosario does begin to speak in English, when he states "Uh, I just moved there. I just came from Santo Domingo and moved there". (Ex.3).

To recap, Agent Campbell stated the *Miranda* warnings in English. Agent McDonough restated the warnings in Spanish. Rosario indictated he understood the warnings given. Although

Spanish may be Rosario's native language, he also understands and speaks English to some meaningful degree. Rosario always spoke to the CI in English, and most of his interview with Agent Campbell was in English. There is no evidence that Rosario was coerced, intimidated, or decieved into speaking with Agent Campbell. And there is no evidence that he was physically, mentally or emotionally compromised in any way. The court finds that Rosario was sufficiently warned of his Fifth Amendment rights as required by *Miranda,* and, in the totality of the circumstances surrounding his interrogation, that his waiver of those rights was made with a full awareness of the nature of the rights abandoned, and the consequences of his decision to abandon them. *Moran v. Burbine,* 475 U.S. at 421. The State has proven by a preponderance of the evidence that Rosario knowingly, intelligently, and voluntarily waived his *Miranda* rights.

The finding and order of the court is:

Defendants Pedro Rosario's motion to suppress is DENIED.

Dated: _____, 2021

Justice, Superior Court

20